Beatty, C. J.
The Hale & Norcross Silver Mining Company is a corporation, organized under the laws of California, with its principal place of business at the city of San Francisco. It is the owner of one of the mining claims on the Comstock lode, in the state of Nevada, where for many years it has been' engaged in the business of mining gold and silver bearing ores.
The plaintiff, M. W. Fox, since the year 1887, has been at all times a stockholder of said corporation. In August and September, 1890, he addressed communications to its board of directors, and to the individual members of the board, charging, in substance, that for three years the corporation and its stockholders had been systematically plundered, and its property stolen, to the amount of more than $2,000,000, by means of a fraudulent conspiracy and combination between said directors and the owners or lessees of the mills employed in the reduction of the ores extracted from the company’s mine; that the devices resorted to in furtherance of the object of this conspiracy were the mixture of worthless rock with high-grade ores so as to obscure their value, and at the same time increase the quantity of material to be put through the mills; the concealment from the stockholders of the average value of the ores, as thus reduced; a fraudulent system of milling by which only a small portion of the precious metals contained in the ores was returned to the company; and a disposition of the stolen bullion in a manner intended to conceal the theft. He further stated in his communication to the board that he was prepared to furnish sufficient evidence of the truth of his charges, and demanded that the directors should institute an action in the proper court, in the name of the company, *378 to recover from the conspirators the full amount of its losses.
Nothing having been done by the directors in response to this demand, the plaintiff commenced this action, in which he joined as defendants the corporation, all the individuals who had served as its directors from 1887 to 1890 inclusive, and the owners of the several mills in which its ores had been reduced during the same period — these last being sued by fictitious names. The summons does not appear to have been served on any of the mill-owners, but the other defendants filed their answer to an amended complaint, and on the issues so made the cause was brought to trial November 18,189 L. During the progress of the trial the complaint was further amended by the insertion of the true names of the mill-owners sued by fictitious names, and by the addition of some new allegations; and on March 6, 1892, at the close of the trial, a final amended complaint was filed, for the purpose, as stated, of conforming the pleadings to the proofs.
All the material allegations of these amended complaints were either denied by the answers of the several defendants, or were by the court treated as denied. On June 11, 1893, the superior court filed its findings and conclusions, and entered its decree in favor of the plaintiff for the benefit of the corporation defendant, and against the other defendants (except Hobart, a mill-owner, who had died on June 2d, and as to whose estate all proceedings were continued) severally for various sums. As against Hayward and the Nevada Mill & Mining Company (a corporation)—mill-owners—and Levy, who had been president of the Hale & Norcross company during the whole period from 1887 to 1890 inclusive, there were several judgments for the entire amount of the company’s losses, estimated at $1,011,-835. As against the other defendants—directors of the corporation—there were several judgments in smaller and varying amounts, corresponding, as it is claimed, to the losses sustained by the corporation during their *379 respective terms of office from overpayments to the mill-owners for the crushing and reduction of ores.
Execution was directed to issue upon these judgments, but it was provided that no more should be collected thereon than said sum of $1,011,835, with accruing interest and costs. And a receiver was appointed, to whom the amount so collected was to be paid, and who was authorized and directed by the judgment to pay over to the attorneys for the plaintiff—as compensation for their services—25 per cent of all sums collected. In due time all of the defendants against whom judgment had been rendered moved for a new trial upon a settled statement of the case, and, their motion having been denied, they have taken this appeal from said order and from the judgment.
The large amount involved in the controversy, the difficulties presented by the subjects of investigation, the great length of the trial, the immense mass of evidence, consisting largely of closely printed columns of figures, and the ability, industry, and ingenuity of counsel have combined to raise an unusual number of difficult questions for our decision, in the discussion of which it will be necessary to state in considerable detail many of the matters contained in the record. It will be more convenient to make a particular statement of these matters in connection with the several assignments of error to which they relate, but it will facilitate the discussion to state at the outset the general nature of the issues presented by the pleadings, and the facts as found by the superior court.
In his last amended complaint, filed" as above stated, after the evidence was all in, and for the declared purpose of conforming the pleadings to the proofs, the plaintiff alleges, among other things: That between the 1st of January, 1887, and the 1st of July, 1890, the Hale & Norcross Silver Mining Company delivered to the Chollar or Nevada mill, and to the Vivian and Mexican mills, at or near Virginia City, in the state of Nevada, not less than 80,000 tons of gold and silver bearing ore, *380 the property of said company, to be by said mills crushed and milled. That said ores were crushed and milled at said mills, and were of the value of not less than $3,250,-000. That said Chollar or Nevada mill was the property of the Nevada Mill & Mining Company, a Nevada corporation, organized under the laws of that state for the purpose of owning, leasing, and operating mills for crushing gold and silver bearing ores, and of which the defendants, Hayward and Hobart, were large stockholders. That the said Hayward and Hobart, acting with other persons in a conspiracy to defraud the Hale & Nor-cross Silver Mining Company, controlled and directed all the affairs of said Nevada Mill & Mining Company and of the Mexican mill during all the times mentioned in the complaint, and that all the fruits of said conspiracy Paine to the hands of said Hayward and Hobart. That said persons and corporations (owners, stockholders, and managers of mills) were at all times mentioned in the complaint also the owners of a large number of shares of the capital stock of the said mining company» and fraudulently and unlawfully, in aid of said conspiracy, procured a sufficient number of proxies of other persons in whose names stock was standing, but who were not the real owners thereof, to elect all the directors of said mining company at the annual elections, held March 9, 1887, March 14,1888, March 13,1889, and March 12, 1890. That said directors, so chosen, were at all times controlled by, and acted in subserviency to and conspired with, said mill-owners and managers in all their official acts and proceedings, and in all matters connected with" the management and business of the mining corporation and its mine. That immediately after the election of said directors they formed and organized a fraudulent combination and conspiracy with said mill-owners for the purpose of cheating and defrauding the Hale & Norcross company and its stockholders by divers cunning and unjust practices, among which were the following: That the mill-owners appointed and selected all the agents and employees about.the mills, *381 and having, by means of said combination and conspiracy, the control of the mining company, they caused all of the ore extracted from its mine to be crushed and milled at the mills belonging to or controlled by them, and caused the superintendent of the mining company to suppress or withhold from its stockholders any report of the assays of such ores. That said superintendent did cause assays to be made of every carload of ore extracted from the mine, and reported the same to the directors, not, however, for the purpose of protecting the stockholders, or as a check upon the mills, but merely as a basis for a division of the fraudulent gains of the combination. That said directors, with the consent and approval of the millmen, caused the superintendent of the mine to extract large quantities of low-grade ores of a value below the cost of mining and reduction, and to mix these with the high-grade ores for the double purpose of concealing from the stockholders the real value of such ores, and of giving constant employment to the mills at an extravagant rate of compensation. That the loss to the mining company caused by the mining, transportation, and milling of said low-grade ores amounted to about $500,000. That the mill-owners caused false and fraudulent assays to be made of the pulp of said ores, and, knowing them to be false, represented them to be true. That said mill-owners, in furtherance of the objects of the conspiracy, caused all of said ores to be handled by a fraudulent system of imperfect milling and reduction, intended to leave in the tailings, slimes, and residues a large portion of the gold and silver contained therein, which tailings, slimes, and residues were afterward worked over for the joint benefit of the conspirators, to the damage of said mining company and its stockholders in the sum of about $1,000,000.
That said directors, in furtherance of the conspiracy, ordered and permitted all of said ores to be milled at said Mexican, Vivian, and Chollar or Nevada mills, at the exorbitant and excessive rate of $7 per ton, $3.50 per ton being a fair and reasonable price—to the damage of *382 said mining company and its stockholders in the sum of $280,000.
That about 6,000 tons of ore were delivered to the Virginia & Truckee Railway Company, to be transported to the Chollar mill, which were never accounted for, causing a further loss to the company and its stockholders of $480,000.
That the aggregate losses occasioned by these various acts of the conspirators amounted to $2,100,000, a large portion of which has been divided up and distributed to the directors of the mining company.
The defendants were not permitted to file any answer to this last amended complaint, but their answers to the second amended complaint were allowed to stand as. answers to the last amended complaint, and, so far as its allegations were new or different from previous allegations, they seem to have been treated as if they were in issue, and I shall assume that they were so treated. The answer of the corporation and its directors admits the delivery of its ores to the mills named in the complaint, for the purpose of milling and reduction, and the answers of the mill-owners admit the receipt of said ores, but it is denied that they were of the value alleged, or of any greater value than $1,879,094.68, less the cost of transportation and reduction. Aside from these admissions, it may be said with substantial accuracy that every material allegation of the complaint is put in issue. Hayward and Hobart deny that they were owners or lessees of, or engaged in operating, any of the mills named in the complaint. The Nevada Mill & Mining Company, of which they were stockholders, admits that it owned and operated the Chollar or Nevada mill, and received and worked a portion of the Hale & Norcross ores.
Upon these issues the findings of the superior court were generally in favor of the plaintiff, and I shall merely note, in this connection, some of the more important particulars in which they were otherwise.
It was found that Hayward, Hobart, the Nevada Mill *383 <fe Mining Company, and Levy, did, with the consent and approval of the directors of the Hale & Norcross company, command the superintendent of the mine to extract large quantities of low-grade ores, and mix them with high-grade ores, for the fraudulent purposes charged in the complaint, and that the cost of mining, hoisting, transporting, and milling said low-grade ores caused loss and damage to the mining company; but there is no finding as to the quantity of such ores mined and sent to the mills, or of the amount of the damage thereby caused.
It is not found that all or any part of the fruits of the conspiracy came to the hands of Hayward or Hobart, otherwise than by the general findings to the effect that they were received by the whole body of the conspirators.
There is no finding as to what was the reasonable price of milling Comstock ores during the years 1887-90. It is found that the actual cost of milling the ores in controversy was $4.50 per ton and no more, and that the charge made and allowed of $7 per ton was fraudulent, exorbitant, and excessive to the extent of $2.50 per ton. But it is conceded that this is not a finding of what an honest miller, entitled to a reasonable compensation for the use of his mill, might properly have charged. It is a finding only of the actual cost of reduction, without allowing any thing for the use of the mills, the court being of opinion that these mill-owners, participants as they were found to be in a conspiracy to defraud the mine-owners, were entitled to no compensation for the use of their mills.
It is not found that any ores delivered to the railway company for transportation to the Nevada mill were unaccounted for, but, on the contrary-, it is expressly found that all such ores were accounted for.
It is not found that the mine or car sample assays were used by the defendants as a basis for the division of profits, or that any profits were divided, but, in general terms, it is found that all the defendants, including the directors of the Hale & Norcross company, re *384 ceived and appropriated the entire amount of which the corporation and its stockholders were defrauded, viz.: $1,011,835.
In some particulars the findings go beyond the allegations of the complaint. It is not alleged, but is found, that Hayward, Hobart, and the other conspirators controlled and directed the business and affairs of the Vivian mill, as well as of the Nevada and Mexican mills. It is not alleged, but is found, that the defendant Levy was president of the board of directors of the Hale & Norcross company during the whole period from 1887 to 1890, inclusive.
The quantity of ore alleged to have been delivered at the mills for reduction was not less than 80,000 tons, and its value is alleged to have been not less than $3,250,000. It was found that 88,887 tons were delivered, of the value of $3,505,361.
The defendants, in support of their appeal from the judgments, contend that they are erroneous in form and substance; and, in support of their appeal from the order denying a new trial, contend that the findings of the superior court are against the evidence, and are vitiated by numerous errors committed in the course of the trial in ruling upon objections to the evidence, and upon other matters.
The most important questions which we are thus called upon to determine relate to certain legal propo- • sitions, as to which our decision must become a precedent in future controversies; but the questions which have been most elaborately discussed by counsel, and which go most directly to the merits of this case, relate to the sufficiency of the evidence to sustain the findings of the superior court, and these I shall consider first.
It is contended that there is no evidence to support the findings as to the alleged conspiracy to defraud the Hale & Norcross company. So far- as the defendants Hayward and the other mill-owners are concerned, it does not seem to be of much consequence whether these findings can be sustained in their full extent or not, *385 since their liability is sufficiently established by other and independent findings. But, with respect to the liability of the directors of the Hale & Norcross company, the findings as to their active participation in the conspiracy are very material.
' The evidence upon this point which most nearly affects the directors of the corporation is that which relates to their election. It seems that in 1887, and for some time prior thereto, the bulk of the Hale & Nor-cross stock was in the hands and under the control of certain stockbrokers in San Francisco. On the books of the company it stood in the names of trustees of these brokers, but, according to their theory, it was the property of their customers. The evidence in this record as to the exact relations between broker and customer is not very explicit, but what they really were is a matter of common knowledge, with which this court has been made especially familiar by a series of cases recently decided here, involving a construction of the constitutional provisions against sales on margin. (Cashman v. Root, 89 Cal. 373; 23 Am. St. Rep. 482; Wetmore v. Barrett, 103 Cal. 246; Sheehy v. Shinn, 103 Cal. 325; Baldwin v. Zadig, 104 Cal. 594; Kullman v. Simmens, 104 Cal. 595.) I conclude, therefore, that this Hale & Norcross stock was held as mining stocks were at that time generally held by the San Francisco brokers. It had been purchased on orders from dealers and speculators upon deposit of the customary margin, and bad been transferred to the trustees of the brokers as security for their advances. It was, in other words, according to the theory of the broker’s contract, a pledge, but, according to the constitution, it was the property of the broker, and the subject of an unlawful and void contract of sale. It is not necessary, in my opinion, to decide who, under these circumstances, had the strict, legal right to vote the stock so held. Conceding that the brokers could lawfully vote it at the annual elections of the directors of the corporation, they were, nevertheless, hound to vote it in the interest of those for whom they *386 had purchased it. It seems, however, from the evidence that they gave proxies often as a mere matter of favor or professional comity, and occasionally for a consideration, to any one who chose to make a contest for the control of the board. By this means the defendant Levy carried the elections for some time prior to 1887, and had been made the president of the board. As president he was invested by the by-laws with the sole management of the business of the corporation, subjéct to the advice of the board of directors. When the election of 1887 was approaching, Hayward, Hobart, and other stockholders of the Nevada Mill & Mining Company — who were considerable owners of stock in the Hale & Norcross company — determined to contest with Levy for the control of the board. A compromise was, however, effected, resulting in the election of a board acceptable to both parties, and the retention of Levy in the office of president. As a part of this arrangement an agreement was entered into between Levy and the mill-owners, by which he was to receive one-eighth of the profit on the crushing of all Hale & Norcross ores milled by them. This agreement was, of course, secret, and there is no evidence that its existence was known to any member of the board of directors, except Levy and his partner Hoefiich. Sell and Bridge, who ceased to be directors in March, 1888, knew of it after that time, but there is no direct evidence that they had such knowledge while in office. None of the directors, however, had any substantial interest in the corporation. A majorit}’’ of them owned but 5 or 10 shares, respectively, out of a total of 112,000 shares, and these trifling amounts of stock had, in several instances, been transferred to them by Levy or the mill-owners for the express purpose of qualifying them to serve. Being chosen in this way and receiving no compensation for their services, except $5 for each meeting of the board at which they attended,.they gave to the affairs of the company the amount of attention that might have been expected. Several of them seem to have known *387 next to nothing about the operations at the mine. While others took a little more trouble to keep themselves informed in a general way about the mining of ores and the price paid for reduction, they seem one and all to have intrusted the management of the entire business to the president, Levy, and to the superintendent of the mine; and, if these officers, by abuse of their trust, caused the loss and damage to the mining company which the court has found, the evidence warrants the conclusion that the directors were at least guilty of gross negligence. But, except as to Levy, Hoeflich, Sell and Bridge, I do not think there is any evidence that the directors knew of the unlawful agreement between Levy and the mill-owners, or that they were active participants in the conspiracy and frauds alleged in the complaint. That this was the view of the judge of the superior court seems to follow, not only from his decision upon the separate motion of the defendant Wheeler for a new trial, but from the amount of the several judgments rendered against him and the other directors. In denying Wheeler’s motion the judge declared, in effect, that he did not believe him to have had any share in the frauds upon the company, but he was held responsible for the consequences of his gross negligence—that is to say, he was held liable for the excessive price of $2.50 per ton paid for milling the ore reduced during the time he was director. The same judgment was rendered against all the other directors except Levy — against whom there was a several judgment fer the entire loss found to have been sustained by the Hale & Norcross company. (Hoeflich having died pending the trial, the action was dismissed as to him.) This discrimination shows that, notwithstanding the sweeping language of some of the findings, the superior judge did not really intend to convict the other directors of the fraudulent conspiracy charged; for, if he had found them equally guilty, they would have been liable to the same extent as Levy. Besides, as above shown, he expressly declared that he did not hold Wheeler guilty, *388 and the evidence against Wheeler was substantially the same as the evidence against the other directors.
For these reasons I think it must be held that the. finding as to the directors other than Levy, that they were participants in the frauds alleged, is not sustained, except so far as they were made participants by a culpable negligence which enabled others to consummate such frauds. This, indeed, seems to be conceded by counsel for respondent in their argument upon Mr. Wheeler’s appeal, in which they contend that the judgment against him is fully sustained by the proof of negligence—a point to be considered hereafter.
It is next contended that the evidence does not sustain the finding that Levy, with others, controlled the Nevada mill. I do not think this point merits discussion, for the reason that the finding is immaterial. It harms no one else, and does not affect the liability of Levy one way or the other.
The next finding attacked is that in which it is found that Hayward, Hobart, and the Nevada Mill & Mining Company controlled and managed the Mexican mill. The evidence on this point is conflicting, and I think the fact—clearly proved—that Hayward and Hobart paid to Levy his one-eighth share of the profits on the crushing of the Mexican mill, in the same manner and at the same time that they paid him on account of the crushing at the Nevada mill, is sufficient to sustain the finding as to them. Their payments, however, are not evidence against the mill company, and I cannot see that there is any evidence to sustain the finding as against it.
It is next claimed that there -is no evidence to sustain the finding that Hayward, Hobart, and the Nevada Mill & Mining Company controlled and operated the Vivian Mill, and this contention, I think, must be sustained. The position of respondents’s counsel with respect to this point may be best shown by quoting their entire argument. They say: “The arrangement with Levy, which was made before any of the ores of *389 the Hale & Norcross were milled, contemplated that he should have one-eighth of the profits of milling all the ores of the Hale & Norcross mine, without regard to where it was milled. The entire business of milling the ores was turned over to Hayward, Hobart, and the Nevada Mill & Mining Company. They had complete control of the affairs of the mining company so far as the milling of its ores was concerned. It is not claimed that any one else ever milled a pound of its ores. The milling of the ores began at the Vivian mill. Is there any doubt but that the same parties who had the ores sent to the Nevada and Mexican mills had them sent to the Vivian? The ownership of the mill is a matter of no consequence. Who controlled and managed the milling of the ores?”
It will be observed that there is no reference here to any page or folio of the record, and I can only say that, after a very careful reading of the whole of it, I have failed to find anything to sustain the assertions of counsel. The only arrangement with Levy of which there was any evidence was, not that he should have a share of the profits of milling all ores of the Hale & Nor-cross mine, without regard to where they were milled, but only that he should have one-eighth of the profits on any ore milled by Hayward, Hobart, and the parties represented by them, including the Nevada Mill & Mining Company. There is no evidence that the entire business of milling the ores was turned over to Hayward, Hobart, and the mill company, or that they had complete control of the affairs of the mining company, so far as the milling of its ores was concerned; and it is not only claimed, but conceded, that the Vivian mill, with which the defendants are not shown to- have had any connection, milled nearly 5,000 tons of the ore. It does appear that, owing to the merely passive attitude of a majority of the board of directors of the Hale & Norcross company, the actual control of all its affairs was in the hands of Levy, the president of the board, and it is obviously true that it was to his *390 interest to give the milling to those in whose profits he was to share. But it does not follow that he could have given no milling to outside parties. What the evidence shows is that toward the end of 1887, when the Hale & Norcross company commenced extracting considerable quantities of ore from the large ore body then recently developed, the Nevada and Mexican mills were crushing for other companies, and neither of them received any Hale & Norcross ore for several months after that company commenced crushing. During that time they were all sent to the Vivian mill; but, as soon as the Nevada and Mexican mills were ready to handle them, the employment of the Vivian mill ceased, from which it would appear that such employment was only a temporary expedient for working such ores as could not be kept for the mills in which Levy was interested, and the circumstances are entirely insufficient to warrant an inference of the principal fact which it was incumbent upon plaintiff to prove, in order to recover from Hayward, Hobart, and the Nevada Mill & Mining Company for losses on the working of ore at the Vivian mill. Moreover, since the only proof that Hajrward and Hobart controlled the Mexican mill was the evidence furnished by their own books of account that they had paid Levy one-eighth of the profits of the crushing at that mill, the absence of any evidence that they had paid anything on account of the work at the Vivian Mill is doubly significant. But, besides all this, the plaintiff, in his last amended complaint, which was expressly designed to conform the pleadings to the proofs, omitted, ex industria, apparently, to charge that Hayward and his associates had any thing to do with the Vivian mill, and the special finding of the superior court as to the separate losses on the ores milled at the Vivian mill, which was doubtless drawn or suggested by counsel for plaintiff as the basis for a modification of the judgment, indicates his lack of confidence in the sufficiency of the evidence to sustain the general finding as to the losses at the Vivian mill. It must be held, *391 in my opinion, that this finding as to the control of the Vivian mill is contrary to the evidence, as it is unwarranted by the complaint.
It is next contended that the finding to the effect that Hayward, Hobart, and the Nevada Mill & Mining Company, in conjunction with the other defendants, controlled all the business affairs of the Hale & Nor-cross company is against the evidence. This finding is material only so far as it relates to the mining and milling of the Hale & Norcross ores, and as to those matters the evidence fully warrants the conclusion that a majority of the directors were, as above stated, simply acquiescent or passive, and that Levy did as he pleased. Whatever inference, therefore, as to participation by the mill-owners in the control of the mining company may be legitimately drawn from the existence of the unlawful contract for a division of the profits of the milling, or from the manner in which the ore was milled, or from any inadequacy of returns of bullion, or neglect of proper precautions in behalf of the mining company, is to be considered as a fact proved. Undoubtedly, the existence of the contract supplied a motive to both parties to increase the amount of milling by the extraction of low-grade ores, and it may fairly be argued that it also afforded an inducement to Levy to connive at a careless and inefficient system of milling by which a larger number of tons would be milled at the same cost, and consequently at a larger profit. But proof of a motive to commit a wrong is scarcely sufficient by itself to prove that the wrong has actually been committed, and it remains to be considered whether there was any other substantial evidence of the mining of low-grade ores or of imperfect milling.
This brings us to the questions which have received the principal attention of counsel both in the oral and printed arguments, a proper discussion of which involves a preliminary statement in regard to the custom prevailing along the Comstock lode in regard to the mining and reduction of its gold and silver bearing ores.
*392 It sufficiently appears from the evidence in this record, and is a notorious fact, that the ores extracted from the Comstock lode since 1887 are of a lower grade, and are produced in smaller quantities than in former years. Much of the ore at present mined barely pays the cost of mining and reduction, and much is found in the vein, mingled with ore of a better grade, that falls below that standard. Since the question whether such low-grade ores are worth extracting cannot, as in the case of richer ores, be determined by inspection, it is absolutely necessary to have daily assays of samples of the ore from the different drifts and levels in which the work is being done, in order to tell what to take and what to leave. It is also necessary, as a check upon the millers, to have assays of the ore hoisted to the surface and deposited in the ore-bins for transportation to the mills. Accordingly, numerous assays are daily made of specimens taken from the various drifts and levels in which work is being prosecuted, and in addition to these there is an assay of what is known as the car sample, which is obtained in the following manner: Each carload of ore— containing about a ton weight—when hoisted to the surface, is pushed by a carman along the track to the ore-bins, and, as it passes what is known as the sample-box, he takes from.the car and deposits in the box a handful of the ore. At the end of twenty-four hours the box is emptied, its contents thoroughly mixed, and about eight pounds taken out as a sample of the whole. This sample is taken to the assayer, who breaks up the larger pieces in a mortar, mixes the whole as thoroughly as he can, and takes out about a pound for assay. Before weighing the specimen or sample to be assayed it is thoroughly pulverized and dried, so as to get at the quantity of gold and silver in a ton of dry ore. The mode of making the assay is not described in the evidence, whether.by fluxing and melting in a crucible, or by other means; but it is not questioned that the methods employed were sufficient for the purpose of ascertaining the exact quantity of pure gold and. silver *393 •contained in the final sample selected by the assayer. Besides these mine samples or car samples, as they are called, taken and assayed as a guide to the miners and a check upon the mills, there are also taken pulp or battery samples at the mills in the following manner: The ores selected for milling are dumped from the cars in which they are hoisted to the surface into large bins overhanging the railroad, from which they are drawn through apertures opened and closed by sliding gates directly into the cars, upon which they are transported to the mills. Here they are again dumped from the railway cars upon an iron grating called a grizzly, which allows the finer portions to pass through into an ore-chamber, adjacent to the batteries, and the coarser portions, after passing through the rock-breakers,'fall into the same receptacle, from which the ore is fed by the action of machinery into the batteries. In the batteries, by the fall of heavy stamps and the constant flow of a stream of water, the ore is reduced to a thin pulp, which, by the action of the stamps, is continually splashed against the perforated screens which inclose them, and through which the water passes, carrying in suspension the finely crushed particles of the ore. After leaving the batteries the pulp flows to and through a series of tanks, in which the sand and slimes are settled, preparatory to placing them in the amalgamating-pans. On the way from the batteries to the tanks, samples of the pulp are taken every hour, by passing a dipper under a spout, through which all the pulp flows. From the dipper the sample so obtained is transferred to a large can, conveniently placed, and this, at the end of twenty-four hours, is set on the boilers, for the purpose of evaporating the moisture. When dried the whole mass is thoroughly mixed, spread out in a thin layer, divided into squares, and three samples taken and put in paper bags—one for the assayer of the mine, one for the assayer of the mill, and one sealed up for future reference in case of discrepancy between the mine and mill assays. The settlement between the miller and. miner *394 is usually based upon the mine assay of the mill sample, the miner expecting to receive in bullion a proper percentage of the gold and silver contained in the ore, as determined by this test.
It has never been the custom on the Comstock for the miner to supervise the taking of the mill samples. Occasionally a man has been employed by some of the mining companies to watch the milling at custom mills, but usually no such precaution is taken, the car sample assays, which are daily compared with the pulp assays, being deemed a sufficient check on any misconduct or negligence of the miller, besides which there is the additional security afforded by the manner in which the ore is handled from the time it leaves the mouth of the shaft until it leaves the mill as tailings. Ores of all grades are dumped promiscuously into the bins; by their own gravity they are carried from the bins to the railway cars, and from the railway cars through the grizzlies and roclc-breakers to the ore-house, from which they are fed by machinery to the batteries. From the batteries they pass, in the form of a stream of muddy water, to the settling-tanks. In this process it seems impossible that there should be any sorting of ores with a view to sampling. On the contrary, the result must be a more and more thorough mixing. It seems equally impossible that any material quantity of the ore could be lost, or otherwise diverted, without detection. The samples taken in the mill from hour to hour are taken by the men employed about the batteries and pans, working on different shifts, and in the presence and view of various other employees, to whose observation any systematic attempt to debase the samples would necessarily be exposed.
Before leaving the subject it may be well in this connection to state briefly the manner of treating the pulp after it leaves the batteries, according to the process of reduction commonly employed with what are known as the fr§e-milling ores of the Comstock lode—the process actually used in reducing the ores in question here. *395 The pulp flows from the batteries to and through a series of sand-tanks, and from these through a similar series of slime-tanks. In the sand-tanks the coarser and heavier of the solid material is settled, but the evidence shows that there is mingled with the Comstock ores, and especially the Hale & Norcross ores, a large percentage of sticky clay, which composes that part of the pulp known as “ slimes,” in contradistinction to the sand which results from the crushing of the quartz rock. These slimes, it appears, do not readily settle, and, with the largest number of slime-tanks that can be placed in a mill, the overflow of the last tank will carry some solid material, and this material contains some gold and silver, the ownership of which is one of the questions in this case; for the evidence shows that, although the Nevada and Mexican mills were provided with a full complement of slime-tanks, yet for every 10 tons of ore crushed in the batteries one ton of solid material passed out of the mill into the slime ponds or reservoirs, where it was finally collected and claimed as the property of the mill-owners. That part of the pulp? both sand and slimes, which settles in the tanks is shoveled out upon the sand floor, from which, after mixing, it is transferred to the amalgamating-pans. In the amalgamating-pans it is rapidly stirred and ground, and at the same time treated with certain chemical agents, designed to free the gold and silver from combinations that prevent them from amalgamating with the quicksilver with which the pans are charged. In the process of amalgamation time, as well as proper chemical treatment and a proper allowance of quicksilver, is an essential element—that is to say, the longer the process is continued the larger is the proportion of gold and silver amalgamated. But there is a practical limitation to the time that can be economically given to the amalgamation of even high-grade ores, and this is more especially true of low-grade ores; for the additional percentage of the precious metals saved by continuing the process beyond a certain point amounts to *396 less than the cost of running the pans, and this point is sooner reached in working low-grade ores than in the case of more valuable ores. By failing to continue the process a proper length of time—that is, to the point which is economically justified by the grade of the ore— a part of its legitimate value is lost in the residues or tailings of the mill.
After the pulp has been worked in the am algamatingpans for the time which the amalgamator deems sufficient it is drawn off into another set of pans, called “ settlers,” where it is more slowly stirred for a time, completing the process of amalgamation, and allowing the quicksilver with the amalgamated metals to settle, preparatory to drawing off. This is done through iron pipes, connected with the bottom of the settlers, through which the amalgam runs into canvas bags. These bags are provided with iron collars, and are locked to an iron framework below the settlers, in such manner that their contents cannot be removed without cutting the bag, or unlocking and detaching it from the frame. The key is carried by the superintendent or foreman of the mill. The bulk of the quicksilver strains through these canvas bags, and is caught and used over again in the pans. What remains in the bags in combination with the .gold and silver is removed from time to time and placed in an iron box, where it remains until a sufficient quantity is collected to justify • retorting. It is then placed in a retort, and the remaining quicksilver expelled by heat. The resulting crude bullion is weighed, and sent to the mint or assay office, as directed by the mine-owner, to whom the returns are made with certificates of weight and fineness by the mint or assayer. Samples of the material remaining in the settlers, similar to the battery samples, are taken every day, one for the mill and one for the mine. A comparison of the assay of the battery sample with that of the settler sample shows how closely the ore is being worked, and is especially useful to the amalgamator as . an indication, of any imperfection of his process, and of *397 the necessity of changing the treatment in case of undue loss.
The mill process, however, does not completely end with the settlers, for the contents of those pans pass to the agitators, where they are slowly stirred, and where in a final clean-up some additional amalgam is collected for the mine-owner. There is a continual discharge of the agitator through an aperture near the top, and the material there discharged is.called tailings. Formerly the milling ended with the discharge of these tailings from the mill, for they were allowed to run off down the-canon, and were never reclaimed by miner or miller. It was discovered, however, in course of time, that a portion of these tailings could be saved by means of blanket sluices, and worked over at a profit. The blanket sluice consists of a double line of flat, wooden troughs, set at a proper grade or inclination, and lined with blankets, over which the mill tailings are allowed to flow, with the result that there is deposited upon the blankets a portion of the quicksilver that is always escaping from the mill, and a portion of the ore, known as sulphurets, ¡which is heavier and richer than the rest of the tailings, but resists amalgamation. The material so caught in the blanket sluices is called concentrates, and is from time to time swept into tanks where it is claimed as the property of the mill-owner. According to the most definite testimony in this case, about one ton of concentrates ought to result from the working of 30 tons of ore, but the quantity varies greatly, according to different estimates. At the Nevada and Mexican mills concentrates were collected in this manner while they were-working the Hale & Norcross ores, and were worked over in the annex-pans of those mills for the benefit of the mill-owners—defendants herein.
Returning from this digression to the findings called in question by appellants, I shall first consider that in relation to the conspiracy to mine and send to the mills ores not worth the cost of mining and reduction. This-finding, like several of the others, is of no consequence- *398 so far as it concerns the question of affirming, reversing, or modifying the judgment. For, as above stated, although the superior court finds that worthless ores were mined and milled to the loss and damage of the mining company, the amount of such damage is not found, and it does not enter into the judgment rendered against any of the defendants—the damages awarded by the several judgments consisting of but two items, viz: the excessive price paid for milling all the ores, rich and poor, and the bullion lost by imperfect milling. But, as it affects the motion for a new trial, and as indicadve of the views of the superior court as to some items of evidence which equally affect other questions, it is deserving of some attention.
According to the testimony of Mr. Mackay—and there is nothing to the contrary—ore of a ear sample value below $14 per ton will not pay the cost of- mining and reduction, by which I understand him to mean .that such ore will pay the bare cost of mining in a going mine, added to the bare cost of milling, without allowing any profit to the miller, or compensation for the use of his mill. His meaning, in other words, is, that a mining company, with its mine already opened and in running order, and owning its own mill, could hoist and mill $14 ore without going behind. In any other sense his. testimony on this point is inconsistent with his testimony as to the usual disparity between the car sample assay and the battery sample ass ¡y, and the percentage of the latter that ought to be obtained by good milling. In order, however, that $14 ore may pay expenses, it must, according to Mr. Mackaj% contain about an equal value of gold and silver. Otherwise, owing to the heavy discount on silver, it will not pay. Now, the evidence in this case shows that the foreman of the Hale & Norcross mine was, in effect, instructed to mine and send to the mill ore assaying by car sample as low as $12, and it appears that the Hale & Norcross ores contained a much larger percentage of silver than of gold. In view of these facts, which *399 show that the practice and the intention was to send to the mills all ores assaying by car sample as high as $12 per ton, and, in view of the understanding that the mills were to receive, not merely the bare cost of working the ores, but $2.50 in addition to the cost for the use of the mills, it cannot be said that the finding of a conspiracy to mine worthless ores is without any support in the evidence.
I account for this finding, and for the fact that no damages were awarded by reason of it, in this way: The superior court held that in view of the contract or understanding that $7 per ton was to be paid for the milling, and the actual return in bullion of only about 75 per cent of the battery sample assay, the parties must have known that not only $14 ore but ore of even higher grade was being mined and reduced at a loss. In determining the question of damages, however, all losses were comprised under two heads, viz: Excessive price paid for milling and loss by imperfect milling. In order to determine these amounts the milling was reduced to actual cost, and the defendants were charged with 75 per cent of the car sample assay. This being done there remained no appreciable loss on the mining of low-grade ores, except upon the comparatively small quantity assaying less than $12, which the court was justified in finding was unintentionally and unavoidably deposited in the ore-bins before the mine assays could be returned. The calculation upon which I suppose the court to have proceeded would be as follows: 75 per cent of $14 is $10.50, or gold $5.25, and silver $5.25, which at 80 per cent equals $4.20, making a net yield of $9.45, of which $4.50 was allowed for milling and $4.95 for cost of mining. I do not think that this basis of calculation was entirely correct in view of other evidence in the case, but it was the basis upon which the court seems to have proceeded, and assuming its correctness, the finding in question and the conclusions of the court are rendered perfectly consistent.
*400 Upon the whole, I think the evidence sufficient to sustain this finding.
The next—and by far the most important—exception to the decision of the superior court relates to the various findings to the effect that Haywood, Hobart* Levy and the other defendants worked the ores of the Hale & Norcross company by a fraudulent system of imperfect milling, by which a large portion of theiivalue was left in the slimes, tailings, and residues of the mills. The substance and effect of these findings is that 88,887 tons of ore were worked; that its value (meaning the total amount of gold and silver contained in it) was $3,505,361, as correctly shown by the car sample assays, and that if said ores had been honestly crushed and milled, and the gold and silver honestly and with reasonable care extracted and accounted for* the bullion yield would have been $2,616,491, whereas the' actual return made by the mills was only $1,826,-873, andthe difference between these two sums, $789,-618, is the main item of the damages going to make up the judgment. The principal, and most direct, evidence in support of this finding consists of the car sample assays, wdiieh it is contended is corroborated and confirmed by proof of certain irregular and suspicious transactions between the managers of the mills and the Carson mint, as well as some other circumstances of like complexion and import.
The appellants contend that, even taking the car sample assay as a criterion of the amount of gold and silver in the ores mined and sent to the mills, the estimate of the superior court is erroneous and excessive to the extent of $34,427, and they sustain their contention by a citation of the pages and folios of the record, to which counsel for respondents have made no reply. If there is any mistake in the computations which apparently demonstrate the error alleged, it was the duty of counsel to have pointed it out. In the absence of any attempt to do so I should perhaps have been justified in assuming that the error was conceded. I have, how *401 ever, gone over the figures as carefully as I could, and, while my computation does not exactly agree with that of counsel for appellants, it does agree substantially. The error of the court amounts to over $34,000, the larger portion of which is found in the first item of the account, where 1,259 tons and 1,590 pounds of ore delivered at the Vivian mill in December, 1887, of the car sample value of $72.12 per ton, is found to have amounted to $113,518.41, when its real value was only $90,856.41, an error of $23,000 in one item.
But the appellants contend that the car sample assays do not, as found by the court, correctly show the true value of the ores, and in this connection they call attention to what they say is an inconsistency between the findings that the value of the ore was $3,505,361, and that it should have yielded $2,616,491 in bullion. I do not deem this an inconsistency. One sum stands for the total amount of gold and silver in the ores, and the other for the percentage (about 75 per cent), which, in the opinion of the court, it should have yielded under-proper treatment.
This objection disposed of, I come to the pivotal question in the case: the value of the car sample assays as a criterion of the value of the ore. The testimony is without conflict that, according to the general custom and course of dealing between the miners on the Comstock lode and the managers and owners of custom mills, the battery samples are, and the car samples are not, regarded as the true index of the value of the ores; that all settlements between the miner and the miller are based upon the average assay of the battery samples, and that the car sample assays are for the guidance of the miners, and useful as a check upon the mills. There is also no conflict in the evidence that the car samples always run above the true value of the ore. This fact was clearly proved when the plaintiff closed his case in chief by the testimony of his own witness, Mr. John W. Maelcay, and it was much more fully and amply proved by a number of witnesses sworn on behalf of the de *402 fendants. The respondent’s counsel, of course, contend that there is evidence on this point to sustain the-finding of the superior court, and they cite certain passages from the testimony of Mr. Mackay and Mr. Holden in support of their argument, which 1 shall proceed to examine.
Mr. Mackay, as I have stated, was the plaintiff’s own witness, and, being examined by them with reference to this matter, said: “We take car sample assays at the mine; that is, the samples of the assays taken on top. There is always a difference between the battery and the assays at the mine; that is, the samples of the assays taken on top; for various reasons there is a good deal of the assay that comes out on top that is covered up; we-cannot get a sample from the top as close as we can in a 500 ton battery, but you get a very fair sample. To answer your question, I can tell you, if I examine the books, what has been the difference between the mine samples and the battery samples. Without stating specifically, I should think about $10 per ton. The' top or car samples are the higher; generally they run pretty close; sometimes they run variable. It is a very difficult matter.”
Being asked what the battery sample ought to be, if car samples properly taken showed an assay of $72.12 per ton, his answer was: “About $62, probably $10 difference.” In reply to another question, he said: “If the car sample was $42.62, that ought to pulp $32 or $33, or somewhere in that neighborhood.”
In answer to a question whether the difference would be less in ore of a lower grade, he said: “ Sometimes, but they will average pretty much that; about from $8 to $10—sometimes not so much, sometimes a little more.”
These clear, direct, and specific statements, made on his direct examination, xere confirmed by his crosséxamination. On his redirect examination, when testifying to the specific point that even battery samples are not always correct, owing to mistakes of the assayers—as illustrated by the fact that he had frequently obtained *403 from ore more than TOO per cent of the battery assay— he added this statement: “If you take 50,000 or 100,000 tons of ore, taken out in a year or two years, and a car sample taken of all those, honestly and fairly taken, with the best methods known, the average of those car samples, some being too high, and some being too low, would pretty closely approximate the value of the ore; there is a difference, of course.”
It is upon this passage of Mr. Mackay’s testimony, standing alone, and construed without reference to what he had previously stated, and upon one even less to the purpose from the evidence of Mr. Holden, that counsel build their whole argument in support of the proposition that there is a substantial conflict in the evidence in regard to the disparity between the average assay of the car samples and the real value of the ore. The most they can possibly claim, however, is that while their only witness as to this matter has, in explicit terms and in answer to direct questions calling his attention to the precise point, stated and illustrated by two examples the fact that the car samples always go about $10 above the battery samples, he has, when testifying with reference to another point, made a statement in more general terms which is entirely inconsistent. For, upon the construction which counsel for respondent insist upon giving to the language last quoted, Mr. Mackay’s answers are necessarily inconsistent. They cannot be reconciled, and counsel do not attempt to reconcile them, upon the theory that in Mr. Mackay’s opinion the car samples are correct and the battery samples are incorrect—both being fairly and honestty taken—for he, like all the other witnesses, testifies directly to the contrary. So far as returns of bullion are concerned, he relies upon the battery sample exclusively. The car sample is merely a check. When the discrepancy between the two becomes too great it is an indication that some thing is wrong in the working of the ore, which calls for investigation and correction. It indicates that there is some fault in the treatment; that there is not enough *404 salt, or blues tone, or quicksilver in the pans, or not enough time allowed for amalgamation, or that there is some refractory combination in the ores which prevents amalgamation. The whole of his testimony from beginning to end, so far as it touches this point, teems with illustrations of his opinion that the battery assay, although fallacious in some instances, owing to mistakes of the assayer, or other causes, is, on an average and in the long run, the only true test of the value of the ores. But, really, the testimony of Mr. Mackay does not require a construction which makes it inconsistent with itself. In the passage relied on by counsel for respondent, he wras referring to the mistakes of assayers and the insufficiency of a few samples, even from the battery, and he intended to explain that, although assays were sometimes too high and sometimes too low, these mistakes would in the case of 50,000 or 100,000 tons of ore taken out in a year or two neutralize each other, and the average would afford a fair index of the value of the ore; or, in other words, would afford a basis from which, with the proper deduction, the real value could be estimated. His closing words, “ there is a difference, of course,” must refer to his previous testimony, in which he states precisely what the difference is. But, even if I were mistaken in this view of Mr. Mackay's testimony, which makes it entirely consistent in itself, and if there were no escape from the conclusion that within a few minutes he made two diametrically opposite statements as to a point upon which all the other witnesses are agreed, I should say unhesitatingly that this did not make a substantial conflict in the testimony in regard to a matter which, whatever the truth about it may be, presents no opportunities for concealment or deception. If it is not true that car samples give an exaggerated value to the ore there must have been many competent and trustworthy witnesses to the real truth, who could have been produced during the months that this cause was on trial. No such witness, however, was produced, unless it be true, as claimed by counsel, that Mr. Holden fills the *405 gap. Mr. Holden was a witness called by the plaintiff in rebuttal for the purpose of proving the percentage of the precious metals that ought to be obtained by a proper system of working ores. As a general expert upon that point he undoubtedly possessed superior qualifications. He is more than usually intelligent and exact in his statements, and apparently perfectly fair. But his testimony was confined to the point stated. He had no experience of his own in mining or milling on the Comstock, and made no pretense of knowing the relative accuracy of car and battery samples. His opinion was that under proper treatment the ores of the Com-stock lode of the grade of those in question here should yield a bullion return of from 80 to 85 per cent of their real value. On redirect examination he made the following answer to a question: “In speaking about 80 or 85 per cent return, I said from a fair sample of the ore, a sample of ore taken in a correct, fair, accurate manner, at any stage. I do not care whether it is taken from the drift or any place, so long as you can get a fair, accurate sample of the ore, it should not change in character from where it is taken from the mine into the pulp.”
It seems a waste of time to notice the claim that Mr. Holden has here testified that car samples are reliable. All that he says is that when you get a fair sample—a sample which truly indicates the value of the ore—it makes no difference if it is taken from the drift in which the ore is mined. The expression he uses may be said to imply that possibly a fair sample might be obtained in that way, but certainly he does not say so, and the whole tenor of his testimony, as well as of all the other witnesses, is opposed to such a notion. There, are reams of testimony in this record to the effect that the only way to sample ores is to take them out and mix them thoroughly, and that the more thorough the mixture the more reliable the sample; the more numerous and the larger the samples the closer the average; and there is nothing to the contrary. Mr. Holden himself, who *406 is a large buyer of valuable ores, tells us what his own practice is. He has the ore spread out and thoroughly mixed. He then takes a large sample—5, 10, or 20 per cent of the whole, according to the grade of the ore— and has it put through a sampling-mill and tested. His process is, in fact, much more thorough and complete than the battery sample tests. He merely states an obvious truth when he says that, when you have got a fair and accurate sample, it makes no difference where or how it was obtained. The ore does not change its character in being reduced to pulp.
I should, perhaps, notice in this" connection a claim advanced in the course of the oral argument, but not made in the briefs, to the effect that Mr. Lyman, a witness for defendants, testified in favor of the accuracy of the car samples. Mr. Lyman was the superintendent of the Consolidated Virginia and other leading mines on the Comstock, and testified from an experience of thirty years in mining and milling Comstock ores. Testifying as to his own practice at the Consolidated Virginia, he stated that mine and car samples were daily taken and assayed in the manner above described, and that samples were also taken from the ore after it had been loaded on the cars for transportation to the mills. On cross-examination he said: “Our object in taking these samples, the mining-car sample and the railroad-car sample, and having them assayed, is to ascertain as near as we can, correctly and positively, the value of the ore extracted from the mine. Then we claim that from those samples we can check the mill; that is, if tlio mill does not make a return of a proper per cent—that is, such a percentage as my experience would dictate was proper—I would make a complaint of the mills.”' Upon this passage of Mr. Lyman’s testimony, disconnected from all he had testified to before,, and what he said almost immediately afterward in the further course of his cross-examination, the claim is made that, according to his evidence, the value of the ore may be correctly and positively known from the car *407 sample assay. But Mr. Lyman does not say so, even in this passage, and what he said directly afterward shows that he did not mean to be so understood. To make this plain I quote that part of his examination immediately ensuing:
“ Q. About what percentage, if you can now recall, in your experience in handling the Consolidated Virginia ores, about what percentage do the mills make of these car samples, the mining-car or the railroad-car samples; about what percentage? A. Well, I never figured them in that manner, and I don’t know.
“ Q,. Well, I understood you to say that you took them as a check? A. Yes, sir; they are there on file; all these figures are on file in the office. We figured on a basis of the assay or value returned from the mine on the battery assay. The percentages are all figured up on the battery assay; that is the contract, I believe. The assays are not made by the mill; they are made by the mine. It is sent to the mine for assay.
“ Q. I will ask you again, how can you ascertain whether or not your ores have been properly worked if the samples, if the battery samples from which samples are taken, are made wholly by the employees of the mill, or by the owners of the mill? A. I have answered that before. The only thing that we have is this check from the mine of the assay.
“Q,. The mine assay? A. Yes, the mine assay; and that mine assay we take as a check. I will say right now, if you will permit me, that we never figured up the per cent on the mine assay, but we figure it from .the pulp from the mill, as the contract calls for.
“ Q,. Well, if you never figured the percentage, do you mean by that that you never paid any attention whatever to the railroad-car or mining-car sample assays when you come to investigate the question as to whether or. not the mill company has returned you or made you a proper return for milling its ores? A. Ho, sir; I don’t mean that at all.
“ Q. Well, what do you mean? A. Well, I mean this: *408 That there is a difference between the car assay in the mine and in the mill. It varies from $10 to $6 apiece. If you figure the 10 per cent on the' mill assay, and if you figure it on the mine assay, it will be so much. The per cent from the mine assay will be less than that from the mill, because there is from $6 to $10 difference; but I have not figured that out, or worked it out, down to a point where it can be answered. Our books will answer-whenever they are called for.”
I have now quoted all the testimony cited by counsel to sustain the finding of the superior court that the value of the Hale & Norcross ores is correctly shown by the car sample assays, and have only to repeat what I said in the beginning, that in my opinion it does not raise a substantial conflict with the evidence of the various witnesses who testified that the car sample assay always exaggerates the value of the ore. It remains only to notice the legitimate argument of counsel for the respondent, that, if the fact is as these witnesses claim, there ought to be some rational explanation of it. I quite agree with counsel on this point, that there must be some cause of uniform operation to bring about the invariable result that the average of the car sample assay always goes above the real value of the ore; and that, if such cause exists, some one ought to be able to point it out. I think, however, that, aside from other suggestions of witnesses and counsel, a perfectly rational and probable explanation is to be found in the evidence. There was a strong preponderance of evidence to the effect that not only on the Comstock, but in other localities, the richer portions of the ore are more easily broken—and in blasting and picking commonly break into smaller fragments—than the poorer portions of the rock, and that the miner who takes the car samples habitually takes the smaller particles in preference to the larger ones, not only because he is instructed to do so, but because under, the operation of a natural law of mechanics the finer portions of the ore are on the top and in the center of the car; that is to say, when the *409 ore is shoveled from the floor of the drift into the car the finer portions naturally rise in a cone in the center of the car, while the larger fragments roll down the sides, so that when the car is filled and the load leveled off the top is composed of the fine ore. I see no reason to doubt the correctness of this explanation, and, allowing it to he true, it is easy to see how at the end of every twenty-four hours the sample-box would contain a lot of ore of higher grade than the mass of that which had been dumped into the ore bins.
If my views as to the effect of the evidence on this point are correct it follows that there is no basis left for the estimate of the court as to the amount of damage sustained by the Hale & Norcross company by reason of fraudulent or imperfect milling. It has already been shown that, even on the theory that those ores actually contained the amount of gold and silver indicated by the car sample assays, their total value was overestimated in the findings by more than $34,000. If this is deducted, and a further deduction of $10 a ton (according to the estimate of Mr. Mackay, the plaintiff’s own witness) is made on account of the difference between the car sample assays and the actual value of the ores, it reduces the estimate of the superior court over $900,-000 on the original value of the ores and makes a corresponding reduction in the amount of bullion supposed to have been lost or diverted; or, in other wmrds, since the defendants were held for about 75 per cent of the gold and silver supposed to have been contained in the ore, the judgment would require to be reduced by nearly $700,000. If, instead of deducting $10 per ton, only half that amount were taken off, the judgment would be reduced by over $350,000, to which must be added the greater portion of the loss apportionable to the ores worked at the Vivian mill, amounting, on the basis of the estimate of the superior court, to about $70,000. I do not add the whole of the supposed loss at the Vivian mill, because, as above shown, the principal-error in overvaluation of the ores, according to the car samples, *410 relates to ores sent to the Vivian mill, and the full deduction xon that account has already been made.
It will be seen that, in all my calculations and estimates, I assume that 75 per cent of the assay value of the ores is a proper return in bullion to be made by the mill. I would not have it supposed that I have overlooked the contention of counsel that there is evidence to sustain a finding that a higher return should be made from ores properly worked. But the obvious answer to this is that the superior court has made no such finding. On the contrary, it is as clear as any mathematical demonstration can be, that the superior court’s estimate of damages rests upon the assumption that a proper return is 74.6 per cent, a fraction less than the percentage i have assumed. The evidence would easily have supported a finding in favor of. a still smaller percentage, while a finding in favor of a higher percentage would have had no substantial support. The evidence of Mr. Holden that a return of from 80 to 85 per cent ought to be made, when properly understood, perfectly agrees with that of the other witnesses. In his estimate he allows for moisture in the ore. He expects a return of from 80 to 85 per cent, but only from the number of dry tons, and the uncontradicted evidence in this case is that the Hale & Norcross ores contain from 8 to 10 per cent of moisture, or, in other -words," that in every 100 tons of ore sent to the mill there were at least 8 tons of water, and, consequently not more than 92 tons of dry ore. Now 82£ per cent (the medium of Mr. Holden’s estimate) of _92 is only 75.85 per cent of 100. This brings his estimate into substantial agreement with those of the other witnesses. Besides all this, it is proper to add that the court had another good reason for discounting Mr. Holden’s opinion as to the ores in question. He had had no experience in working the Comstock ores, and knew nothing about them, except from his dealing in those of a high grade—ores running into hundreds of dollars to the ton, such as would bear transportation to San Francisco and Swansea, and jus *411 tify reduction by smelting, leaching, and other thorough and expensive methods of treatment. The evidence all goes to show that ores of this grade can be economically worked, and commonly are worked, to a higher percentage than ores of a comparatively low grade. The testimony of Mr. Mackay to the effect that in the early history of mining on the Comstock, mill-owners would buy ore from miners at 65 per cent of the car or wagon sample, and work them for what they could get out of them, does not raise a conflict upon this point. In those times there was no discount on silver, and the ores mined were of high grade. There is no evidence that the mode of sampling with a view to such sales from the miner to the miller was the same as that now employed in taking car samples, and it is not reasonable to suppose that the miller would rely upon samples taken exclusively by the miner without any participation by him. No doubt both parties took part in the selection of the samples from the wagons upon which in those days the ores were transported from the mine to the mill, and probably the result of the assays was a nearer approximation to the true value of the ores. But, even supposing it was not, and that a wagon sample giving an assay of $200 to the ton indicated a real value of only $190 or $180—the cost of a ton would be $130, and, if it was, by a more thorough treatment in the pans, such as its value would justify, worked'up to 80 per cent, the yield would be $144, or, in other words, $14 per ton for milling. In ore of greater value the profit would have been correspondingly greater. All that this evidence of Mr. Mackay proves, then, is that the millers in early times felt that they could afford to purchase the class of ore then mined, upon the chance of getting out 80 per cent of the precious metals by careful handling. It is in no wise inconsistent with his opinion that 75 per cent of the battery sample of the class of ores now being mined is a fair return. Mr. Lyman’s testimony is that 73 per cent of the battery sample of the Consolidated Virginia ores is the return they have actually received, *412 but, in answer to questions put to him on cross-examination, he said, in reference to a lot of ore averaging $48.33 per ton by car sample, that, if he had owned them and sent them to mill, he should have hoped for a return of 65 per cent of the car sample assay, and should have expected nothing better. The proper deduction from this answer may be stated as follows: 65 per cent of $48.33, the car sample assay, is $31.41, and this is 81.7 per cent of $38.33, the corresponding battery assay. So it appears that Mr. Lyman would hope to get 81.7 per cent of the battery sample. He does not say that he would regard it as evidence of fraudulent or dishonest milling if he got only 75 per cent, and, according to his actual experience of what he deems correct milling, 73 per cent of the battery sample has been returned.
Finally, it may be said that if the defendants w'ere held for the return which Mr. Lyman would hope to get, i. e., 65 per cent of the car sample assay, the judgment on that basis would be more than $350,000 less than that which wras actually rendered.
It is claimed that there is another serious error in the estimate of losses by milling, arising out of the disregard by the superior court of the discount on silver bullion. . It is doubtful, however, if the evidence in relation to this matter is sufficiently clear to demonstrate the error alleged. The claim is, that in all the car sample assays—the basis upon which the court estimated the bullion contents of the ores in question—the silver was reckoned at $1.2929 per ounce; that is to say, at its standard value according to the number of grains of .pure silver (371.25) in a coin dollar, and that in computing the loss the court has taken the same standard of value, for the missing silver bullion, and awarded a money judgment for the- resulting amount, when the actual market value of the bullion was at least 20 per cent below the standard value. If this is so, it was certainly a very serious error, amounting, according to my estimate, to at least $100,000, and probably to a good deal more; for there can be no doubt that a judgment *413 for the conversion of silver bullion, payable in coin, should be based upon the coin or market value of the bullion, and not upon an arbitrary standard of value above its market value.
I do not find, however, any direct evidence that the car sample assays were made upon the basis of $1.2929 per ounce of silver. The evidence, it is true, does show that the battery or pulp sample assays were based upon that assumed value, and since the car sample assays were made by the same assayer, and at the same time, it is perhaps a fair inference that they were computed on the same basis. But, however this may be, a decision of the point is not necessary here. There must be a new trial of that issue for other reasons, and it is sufficient to indicate our views as to the proper allowance to be made, in case it shall appear that the ore assays were based upon an assumed value of silver bullion different from its market value.
The true method of determining the loss sustained by imperfect or fraudulent milling is to ascertain the quantity of gold and silver actually contained in the ore, as nearly as practicable, next to ascertain what percentage of the bullion contents should be returned by fair and honest milling, and the difference between this amount and the actual return is the actual damage. To make these computations it is obvious that the standard of value must be the same in the assays of ore and in the assays of bullion returned, and it makes no difference whether this is $1.2929 or any other figure, provided that it is the standard used by-the assayer of the ores, and is uniform. By this means alone can the true difference between the proper return and the actual return be correctly determined. When this has been done, in order to determine the amount of the damages for the purpose of the judgment, the money value of the difference must be obtained by allowing for the discount on the silver—whatever it was.
I find that, roughly speaking, the Hale & Norcross ores, according to the car sample assays, contained about *414 $2 of silver to $1 in gold. (This is my own estimate, based upon a comparison of a large number of assays taken at random, and possibly erroneous.) The mint returns of the bullion extracted from these ores show an average disparity considerably less. This is accounted for in great part, by the fact very clearly shown from the evidence, that the mint return was based, not upon a valuation of $1.2929 per once of pure silver, but upon the price which the mint was paying for silver, which was considerably below that rate. This indicates that the amount of silver bullion returned by the mills was underestimated, as compared with the bullion in the ores, for the silver wras valued at less per ounce in the bullion tlian in the ores. It ought to have been estimated on the same basis, and the difference, when ascertained, should have been reduced to its money value.
Since the necessary consequence of these errors in the findings is that there must be a new trial as to the question of damages from imperfect milling, it does not seem worth while to discuss the evidence offered to corroborate the general charge of fraud in the milling— by which I mean the evidence intended to show how it ■was possible to debase the battery samples, or to run the value of the ore into the tailings by improper amalgamation, or to abstract the amalgam, or purloin the bullion. All these things have their place, as tending more or less to corroborate other evidence of improper milling, and are entitled to such weight as the trial judge may think belongs to them, when considered in connection with the more direct evidence of the assay value of the ores, the bullion returns made, and the percentage that ought to be returned with correct milling. There are one or two matters, however, connected with the milling which require to be noticed.
Exception is taken to the finding to the effect that the slimes and concentrates resulting from the working of these ores were the property of the Hale & Norcross company, on the ground that all the evidence shows that,' according to the universal practice and understanding, *415 the slimes and concentrates become the property of a custom mill. This finding, like that in regard to the mining of worthless ores, is not made the basis of any award of damages, and rests upon similar grounds. The court being of the opinion that 75 per cent of the car sample assay was a proper return of bullion, necessarily concluded that a large part of the value of these ores was improperly run into the tailings, and, consequently, that the tailings did not become the property of the mill. And this was a correct conclusion from the premises; for it is only when the milling has been reasonably efficient that the tailings can rightfully be claimed by the mill, according to the custom. But the court gave no separate or additional damages on account of the value of the slimes and concentrates, because their value was included in the 75 per cent of the car sample assays with which the defendants were charged.
A claim is made on behalf of respondent that the superior court was justified by the doctrine omnia prsesumnnter contra spoliatorem, in assuming that the Fíale & Norcross ores were of the value shown by the car sample assays, and, in support of this contention, they cite the celebrated ring case of Armory v. Belamire, 1 Strange, 505. That was a case in which the defendant, a jeweler, had taken a ring, removed the jewel, and kept it wrongfully from the plaintiff, and the jury were directed to make the value of the best jewel that would fit the setting the measure of their verdict, unless the defendant would produce the jewel and show it to be of less value. The meaning and the limitations of the doctrine of this case are stated in the notes appended to the report, in 1 Smith’s Leading Cases, Hare and Wallace’s edition, 589: “It signifies that, if a man by his own tortious act withhold the evidence by which the nature of his case would be manifested, every presumption to his disadvantage will be adopted.....When the nature of a Wrongful act is such that it not only inflicts an injury, but takes away the means of proving the nature and extent of the loss, the law will aid a recovery *416 against the wrongdoer, and supply the deficiency of proof caused by his misconduct, by making every reasonable intendment against him, and in favor of the party injured. A man who willfully places the property of others in a situation where it cannot be recovered, or its true amount or value ascertained, by mixing if with his own, or in any other manner, will consequently be compelled to bear all the inconvenience of the uncercertainty or confusion which he has produced, even to the extent of surrendering the whole, if the parts cannot be discriminated, or responding in damages for the highest value at which the property in question can reasonably be estimated.....
“The presumption contra spoliatorem also arises when a party to a suit or controversy willfully destroys or suppresses, bjr wrongful or dishonest means, a deed, will, or other instrument which belongs to, or would be admissible if called for by, the opposite party, and will justify a court or jury in drawing the most unfavorable inference, consistent with reason and probability, as to the nature and effect of the evidence wnich they have thus been precluded from using and examining as a means for the discovery of truth.....
“ The extent and force of the presumption must evi- ' dently vary with the nature of the wrong and the circumstances under which it wras committed, and it will not, perhaps, even when most hostile, be an absolute . and insuperable bar.....
“The presumption arising from the wrongful destruction or suppression of evidence will not, however, justify a judgment or decree without evidence, nor the substitution of conjecture or allegation for proof; and its legitimate effect is confined to rendering evidence admissible which could not be received under ordinary circumstances, and the deduction of every inference from the evidence actually given in favor of the injured party and against the spoliator. . . . .
“The better opinion would seem to be that the mere fact of withdrawing or refusing to produce an instru *417 ment which belongs exclusively to the party by whom, it is withheld will not render him a spoliator, nor give birth to the extremely hostile presumption which attaches to the wrongful suppression or destruction of the property of others, and will simply authorize the introduction of secondary evidence which will be construed as favorably as the circumstances will permit for the party who is deprived of the means of full and accurate proof. ....
“A line should obviously be drawn between those instruments or means of evidence in w'hich the parties have a common interest, and consequent right to expect that they will be forthcoming when needed, and those which are intended only to meet the eye, or kept solely for the benefit of the person by whom they are withheld, and the conduct of a tenant who refuses to supply the loss of- a lease by the production of the counterpart is viewed in a more unfavorable aspect than that of a merchant or tradesman who withholds private books or papers from a public examination which he may desire to avoid for reasons having little or nothing to do with the particular case in which their production is demanded.”
Applying the doctrine as expounded in the foregoing quotations, it falls very far short of sustaining the contention of respondent.
In the first place, the facts of the case do not make it applicable. The milling of the Hale & Norcross ores was not in itself a wrongful act. The means by which the employment to mill them was obtained was wrongful, and entails the penalties which are to be considered hereafter; but the milling, if properly conducted, was a lawful, legitimate, aud necessary operation. The form of the ores was, of course, changed, and their identity destroyed, but the usual means, and the only means of establishing their value, were taken, and the evidence preserved. There were the car sample and the pulp sample and the settler sample assays, all taken according to the usual course of the business, and all pre *418 served. They constitute the most direct and trustworthy evidence of the real value of the ores, while all other means of proof are indirect and secondary. So far as they are indefinite or uncertain the willful suppression of any secondary evidence or corroborating circumstances, which would tend to clear up such uncertainty, would justify a court in giving to the direct evidence the strongest construction in favor of the other side that it would reasonably bear. But, as has been shown, the evidence in this case is all to the effect that the car sample assay is invariably and largely in excess of the actual value of the ore, and it is not reasonable, in the face of such evidence, to assume the car sample assay as a basis of computation. This is not holding that the respondent is bound by the battery samples, or that a deduction from the car samples of $10 per ton, or of any other definite sum, must be made, but only that the trial court should give proper consideration to the uncoptradicted testimony of all the witnesses, and make such deduction as in its judgment is reasonable in view of all the evidence.
As to the claim that evidence was suppressed by failing to keep any record of the bullion resulting from the working over of concentrates, and by the refusal to produce the books of the Nevada Mill & Mining Company, the record does not bear out the assertions of counsel. There was no record kept in the mill of the working of the concentrates, or, so far as appears, of any other part of the business. The books containing a record of the business of the mill were kept at the office of the corporation, and the testimony of Williams, the superintendent of the mill, is that the account of the proceeds of the concentrates of all the ore worked in the Nevada mill, amounting to 93,000 tons, inclusive of 53,000 tons of Hale & Norcoss ore, was kept in the books of the corporation, and showed a product of only about $14,000. Mr. Williams, when the crude bullion was delivered to him by the foreman of the mill who had charge of the retorting and who kept a memoran *419 duna of the weight, took the bullion to the assayer, who in a few days returned the resulting bars with his certificate of weight, fineness, value, etc., to the office, and he says that in the mean time he made no written entry of the weight, but carried it in his head. This may be a loose way of conducting business, but it is not a suppression of evidence. As to the refusal to produce the books of the company, counsel does not cite the evidence in the record, and I have been unable to discover that any demand for the production or inspection of the books was ever made.
Another alleged suppression of evidence was in the refusal of the cashier and clerks of the Bullion and Exchange Bank of Carson to exhibit the books of that concern at the time of the taking of their depositions. Evan Williams was vice-president and principal stockholder of the Bullion and Exchange Bank, and Hofer, the cashier, and Brown and Peters, the clerks, may be said to have been in his employ and under his control. He was also a stockholder of the Nevada Mill & Mining Company, and superintendent of its mill and of the Mexican mill. But he has never been a party to this action, and at the time the depositions were taken neither Hayward, Hobart, nor the Nevada Mill & Mining Company had been brought in. No demand was then made, nor has any demand been since madej upon any party to this action for a production or inspection of the books of the bank, and bow, under the circumstances, they can be treated as spoliators of testimony is not apparent.
In connection with this subject of suppression and spoliation of evidence, a good deal has been said in reference to the mint transactions, which were more particularly urged in the argument, as evidence of the purloining of bullion, or of large returns secured by the mill-owners from the working over of tailings, etc. As to the weight of this evidence as affecting the question of improper milling, any discussion in this opinion in anticipation of a new trial would be out of place, and with reference to the doctrine of spoliation little need *420 be said. It is claimed that the mint records were improperly kept by Hofer, cashier of the Bullion and Exchange Bank, and also acting superintendent of the mint; and the principal irregularity specified is that, in entering the deposits of bullion, instead of giving the name of the mine or locality where produced, he would enter it as “unknown,” contrary to law and his duty; and the claim is that these fraudulent entries were made at the instance of Williams for the purpose of covering up abstractions of Hale & Norcross bullion. The only law to which we have been cited in reference to this matter ini section 3506 of the Revised Statutes of the United States, which does not make it the duty of the superintendent of the mint to note the place of production of the. bullion. But there is probably some regulation of the department, or perhaps some later statute, which does require some thing of the kind, for the evidence in this record shows that such was the practice at the Carson mint. But it also shows that, long before the reduction of these ores was commenced, there were frequent, deposits of bullion, the source of which was entered as unknown. Indeed, such entries were more frequent before than since that time. I do not discover ainy evidence in the record as to when Hofer first went into the mint, and, consequently, it does not appear that any of the entries referred to were made by him. . Indeed, it does not appear that he was ever the superintendent of the mint—only that he was acting superintendent in August, 1891, a year after these transactions were closed. But, if it is true, as stated by counsel on the argument, that he first went into the mint subsequent to March 4, 1889, then much the larger proportion of the entries of unknown bullion were made before his advent, and in making the comparatively small number of similar entries—assuming that he did make them—he was following the established practice. I can only infer from the evidence that parties sometimes deposited purchased bullion the origin of which they did not know.
*421 I should add that, notwithstanding the effort I have made to comprehend the evidence relating to these matters, I discuss it with some diffidence. It is extremely voluminous, and consists largely of tables of figures. It does not appear to have been introduced at the trial, or printed in the record, with any regard to chronological order, or any other system of arrangement. Very few exact references are made by counsel to the particular folios, and I am far from sure that I have examined with due attention the portions upon which they particularly rely. I have, how'ever, carefully examined the pages cited by counsel for respondent on the oral argument as an illustration of the suspicious practice of the mint officials in entering bullion as unknown. The pages referred to are 1354 to 1360, inclusive. The list contained on these pages seems to have been completely misunderstood by counsel. It does not, from beginning to end, mention the place of production of a single lot of bullion. It gives the name of the depositor, the name of the person on whose account the deposit is made, the name of the person receipting for it, a description of the deposit, whether bars or amalgam,' the weight, the value, and mode of payment. That is absolutely all. Under the heading “ On Account of” appear the names of many different mining companies, and it may be surmised that their mines produced the bullion, but their names are mentioned as owners, not as producers; and in the same column appear the names of other corporations and persons besides the Bullion and Exchange Bank, and in no case is it stated where the bullion was produced. Evidently the list was not intended to show the place of production, and the word unknown” does not occur in it. This being the particular part of the evidence selected by counsel to illustrate their point, I am convinced they have overrated its force.
It does not seem necessary to further extend this discussion of the evidence relating to the values of the *422 ores and the losses caused by fraudulent and imperfect milling.
As to the other element or item of damage—exorbitant charges for milling—the evidence and findings are so clear that nothing is left for decision, except a pure question of law.
The finding of the superior court that the cost of milling did not exceed $4.50 per ton is fully sustained by the evidence; and it is equally clear that $4.50 was not a fair price for milling as between a miner and a miller dealing bn equal terms, and under circumstances entitling the miller to a fair compensation for the use of his mill. The question, therefore, is whether, in view of the manner in which the contract to mill these ores was obtained and executed, the mill-owners are entitled to receive any thing for the use of their mills. If they are there must be a new trial of this part of the case; if they are not, then, so far at least as Levy and the mill-owners are concerned, there is no need of a new trial. As to the other directors against whom there are several judgments the case may be to some extent different.
Were the mill-owners in this case entitled to retain out of the moneys paid them for milling the ordinary and reasonable price of milling, including a fair return on the capital invested in the mills ?
The authorities to which we have been cited, including the case so much relied on by counsel for respondent (St. Paul Distilling Co. v. Pratt, 45 Minn. 215), are all ■consistent with, and several of them directly sustain, the proposition that a trustee who has contracted with himself on behalf of his cestui que trust, and has received the stipulated prices of his goods or services, although he cannot, when called upon to account, retain the whole sum so received, may be, and in equity ought to be, allowed to retain what is equivalent to the benefits and advantages actually received by his cestui que trust; or, in other words, that he is entitled to the reasonable value of his goods or services, measured by their current *423 market price. According to this doctrine the appellants contend that the mill-owners in this case must be allowed the ordinary market price of milling Comstock ores, which was $7 per ton.
But I do not think this case can be determined by the rule applied to cases which involved no element of misconduct, except an express agreement of a trustee to pay himself more than reasonable value.
Here, as has been shown, was a contract which made it to the interest of the actual manager of the mining company to sacrifice the interests of the stockholders by mining and milling ores which would not pay the cost of mining added to the current price of milling. The court has found, and the evidence is sufficient to sustain the finding, that such low-grade ores were intentionally mined and sent to the mills, involving certain loss to the stockholders if the current price were allowed, but involving no loss if the millers were limited to the actual cost of milling. Under these circumstances it was not inequitable to allow only the actual cost of milling. It is true that a large proportion of the ores were of sufficient value to pay a profit pn the mining and milling current rates, with a return of 75 per cent of the pulp assay, and it may be argued that, as to such ores, the market price of milling should be allowed. But in cases of this kind the courts cannot be expected to go into very nice calculations and estimates to save parties from the consequences of wrongdoing; and, where it appears that the intention was to mine and mill ores that would barely pay the cost of handling, and where this intention was in fact carried out, a court of equity is justified in applying to the whole transaction one measure of compensation, and that measure must be actual cost.
My conclusion is that the superior court did not err in requiring the mill-owners to account for $2.50 per ton for all the ores milled by them; and this part of the judgment, which is erroneous only so far as it includes the ores worked at the Vivian mill, may be modified *424 upon the findings contained in the record. The proper sum is $2.50 per ton on 84,079 tons, the quantity of ore sent to the Nevada and Mexican mills, amounting to $210,197.50. To this extent the judgment against Hayward and Levy is fully warranted by the findings and evidence.
As to the Nevada Mill & Mining Company, it would be necessary to reduce this part of the judgment still further on account of the fact that it had nothing to do with the ores reduced at the Mexican mill, but this and all other errors in the proceedings affecting that corporation become immaterial in view of my conclusion that it was never brought under the jurisdiction of the superior court. It is a Nevada corporation, and the only service of summons was made on Evan Williams, the superintendent of its mill at Virginia City, who was at the time of service in attendance upon the trial of this cause, but not engaged in attending to any business of the corporation in this state. Such service was wholly insufficient to confer any jurisdiction over the company, and the judgment as to it is erroneous in toto.
As to the directors of the Hale & Norcross Company, other than Levy, it is not seriously contended that they are liable except on the gound of negligence, and it is clear that such was the opinion of the superior court. Bnt they were not charged with negligence in the complaint, but only with fraud. Fraud and negligence, however culpable, are not the same thing. It is true that, when negligence causes an injury of the same character as would be occasioned by an intentional fraud, it is visited with the same consequences, so far as compensation to the injured party is concerned, but the plaintiff has no right to demand a conviction of fraud when no fraud has been committed; when he relies on . fraud he ought to plead fraud, and when he relies on negligence he ought to plead negligence, not only because the defendant has a right to know what the charge is which he is called upon td meet, but because the defenses are different. An action for relief on the ground *425 of negligence is ordinarily barred by the statute in a shorter time than an action for relief on the ground of fraud. In this case, however, it is contended that the action against the directors is founded upon the liability created by statute, and, consequently, that the same limitation of the right to maintain the action applies as in cases of fraud. (Code Civ. Proc., sec. 338.) The statute referred to is section 3, article XII, of the constitution, which contains the following provision: “The directors or trustees of corporations and joint-stock associations shall be jointly and severally liable to the creditors and stockholders for all moneys embezzled or misappropriated by the officers of such corporation or joint-stock association during the term of office of such director or trustee.”
This clause of the constitution has never been construed, so far as I can discover. According to its literal terms, every director of a corporation is severally liable for the full amount of any misappropriation of its funds during his term of office, without respect to any question as to his own culpability, and the argument of counsel is that it must be enforced according to its letter. Ita lex scripta est, and- hence a director, no matter how innocent he may be, and no matter how hard the case may be, must be adjudged to pay, at the suit of any stockholder, the whole of any misappropriation of corporate funds occurring during his term of office. And, therefore, according to the contention of counsel, if some large stockholder of the Hale & Norcross company, with the sole purpose of protecting his own interests and the interests of the other stockholders, had, by cumulating his stock, secured an election to the board of directors, and, as a member of the board, had opposed the milling of low-grade ores, or the payment of more than $4.50 per ton for milling, and had, to the utmost of his ability, guarded the interests of the company in every direction, he could, nevertheless, have been singled out by any stockholder and compelled to make *426 good the entire loss caused by the willful and corrupt misconduct of a hostile board.
If this construction must obtain, it seems very clear that no man with any property or character to lose will be willing to serve as director of a California corporation, after it becomes known that the constitution contains such a provision. I do not think, however, that the construction contended for can be allowed. It does seem that it was the intention of the framers of the constitution to make each director of a corporation severally liable, whether individually culpable or not, for certain hinds of losses to the corporation occurring during his'term of office; that is to say, he is made liable for embezzlement or misappropriation of corporate funds by officers of the corporation. But, in my opinion, the word “ misappropriation” is to be construed by the maxim noscitur a sociis; it means some thing like embezzlement, or, in other words, it means the misapplication of funds intrusted to an officer for a particular purpose, by devoting them to some unauthorized purpose, and does not apply to the payment of an extravagant price for services or materials properly appertaining to the business of the corporation—which is this case.- For losses occasioned by such means the law affords an ample remedy, without the need of resorting to the constitution against those who are justly responsible, whether by reason of fraud or negligence; but the law does not in such cases visit upon the innocent the sins of the guilty, and, if the liability arises from negligence, the action must be commenced in two years after it accrues, whereas, if it arises out of fraud, it may be commenced at any time within three years after the discovery of the facts. In this case, if the directors had been sued for negligence only in paying too much for milling the ores, the statute of limitations would have been a complete defense as to some of them, and a partial defense as to others. For these reasons I think the directors other than Levy are entitled to a new trial of the whole issue.
Objection is made to the right of the plaintiff, Fox, *427 to maintain the action, upon the ground that the findings and evidence show that he made himself a stockholder after the occurrence of the injuries complained of, for the express purpose of bringing this action; that he acquired but a small amount of stock at that time, and that he never had any substantial interest in the corporation at any time.
The finding of the court is, however, that he was at all times a stockholder, and as this finding is not attacked in the specifications of grounds in the statement on motion for a new trial, we cannot look at the evidence; and in construing the finding we must hold that it means that he was a stockholder in a substantial sense.
Objection is made to the form of the judgment or judgments upon various grounds, but these are objections which should have been made to the complaint. Having waived any objection to the complaint on the ground of misjoinder, etc., I think the objection to the several judgments on account of their mere form comes too late. In form they follow the complaint, and, if the several judgments had been for the respective amounts for which the defendants were liable, the form in which they were entered would have afforded no substantial ground of complaint.
In view of these conclusions upon the main points in controversy, most of the other assignments of error become immaterial, and, so far as the points not herein particularly discussed seem likely to arise upon a new trial, I see no substantial error calling for particular discussion.
To summarize the above views, my conclusion is that the record sustains, or fails to sustain, the findings and conclusions of the superior court in the following particulars:
1. That the defendants Hayward, Hobart, and Levy formed a fraudulent combination and agreement for mining and milling the ores of the Hale & Norcross Silver Mining Company, but that t,he other directors of the mining company were not parth i to this agreement, *428 but were merely negligent in the performance of their duties, and are, therefore, chargeable only with such negligence, and are not chargeable with any actual fraud.
2. That I the Mexican and Nevada mills -were under the control of Hayward, Hobart, and the Nevada Mill & Mining Company, but that it is not shown that the Vivian mill was under their control.
3. That Hayward, Hobart, and Levy, with the acquiescence and consent of the officers of the Hale & Nor-cross company, controlled the affairs of that company.
4. That Hayward, Hobart, and Levy, in pursuance of their agreement aforesaid, caused a quantity of inferior and worthless ores to be extracted from the mine and to be milled, after being mixed with ores of a higher grade. i *
5. That the Hale & Norcross company paid $7 per ton for milling said ores; that the actual cost-of milling the same was but $4.50 per ton; that, by reason of their fraud, as aforesaid, the said defendants were entitled to receive only the actual cost of milling said ores; that, by reason of having been required to pay $7 per ton for milling said ores, the Hale & Norcross company had sustained damage in the amount of $210,197.50.
6. That the evidence is insufficient to sustain the finding of the court that the Hale & Norcross company had sustained damage by reason of the improper milling of the ores in the amount of $789,618, and that the actual amount of damage sustained thereby cannot be determined from the findings of the court.
7. That the Nevada Mill & Mining Company, not having been served with process, was not before the •court as a defendant.
The cause is, therefore, remanded to the superior court with the following directions, viz: The judgment appealed from is set aside, and the superior court is directed to enter a judgment, as of the date of its former judgment, against Alvinza Hayward and H. M. Levy • for the sum; of $210,197.50, with interest from that date, upon the issue pr> sented by the claim for having paid *429 an excessive price for milling the ore in the Mexican and Nevada mills; and upon that issue the order denying a new trial as to these appellánts is affirmed. As to the other appellants, except the Nevada Mill & Mining Company, the order denying a new trial as to this issue is reversed and a new trial thereon ordered. Upon the issue presented by the claim for damages sustained by reason of the imperfect and fraudulent milling, the order denying a new trial is set aside as to all the appellants, and the court is directed upon the evidence already taken in the case, and such other evidence as may be presented by either party, to make findings in accordance with the views hereinbefore expressed. Upon the amount, if any, of such damage sustained by the Hale & Norcross Company, in addition to finding the value of the ore delivered to the mills, the court is directed to find the amount and value of the bullion that should have been returned therefor. The court should also find what amount of this value of the ore delivered to the mills was necessarily lost in working, or would not under fair milling be separated from the baser matter; and also the amount of the money, if any, received by the mills from the working or sale of the tailings or residue of the ores.
Until the Nevada Milling and Mining Company has been brought before the court the court will make no trial of the issues against that company!
Harrison, J., Van Fleet, J., Henshaw, J., Temple, J., and McFarland, J., concurred.