## FOX v. HALE & NORCROSS SILVER MIN. CO. et al.*

### S. F. No. 683; April 9, 1898.

#### 53 Pac. 32.

**Fraud.**—In Charging Fraud, a Complaint must State the facts constituting the fraud—at least, in a general way; and such facts must be alleged with sufficient distinctness to enable the adverse party to come prepared with evidence on the general questions of fraud which will be raised.

**Appeal—Retrial of Case.**—When, on Appeal, the Judgment of the lower court is affirmed as to one cause of action, and reversed and remanded for a new trial as to another cause of action, all the issues involved in the cause of action remanded must be retried, though the appellate court deems the evidence sufficient to sustain the judgment of the trial court on one of the issues.

**Fraud—Presumptions.**—When Defendants are Charged with a fraudulent conspiracy for two purposes, and it is proved for one purpose, the presumptions are still in favor of the innocence of defendants of conspiring for the other purpose.

**Fraud—Evidence.**—Fraud cannot be Conjectured from the Fact that defendants have been guilty of other independent frauds.   The evidence must be satisfactory, within the rule stated in Code of Civil Procedure, section 1833, defining "prima facie evidence" as that which suffices for the proof of a particular fact until contradicted and overcome by other evidence.

**Fraud.**—The Admissions of Questions and Answers of witnesses in evidence, which assumed that certain samples of ore were fair samples, and that assays thereof were fair assays, without proof that such was the case, when the question at issue was whether they were fair samples, and whether they were properly assayed, is error.

**Pleading.**—When the Complaint is Amended in Any material respect, so as to present new questions, on which issues may be taken, defendant may answer, as of course; and in such case the court cannot limit the defenses which may be interposed.

---

*For opinion on rehearing, see case following, post, p. 1005.

Parties—Fictitious Names.—Some of Defendants Were Sued by fictitious names, but the summons was personally served on them. The complaint was afterward amended so as to properly name defendants. Held, that defendants were made parties, within the statute of limitations, when the summons was served.

Appeal—Retrial of Case.—On the First Trial, Evidence was Taken of plaintiff's right to bring the action as a stockholder of a corporation, and the court found facts authorizing plaintiff to sue in behalf of the company. Defendants did not except to the sufficiency of such evidence, or present the question thereof on appeal. The case was affirmed on appeal as to a certain issue, and remanded for retrial as to another issue. Held, the findings being sufficient to show the right of plaintiff in that regard, that the issue as to the right of plaintiff to bring the action as stockholder was not open for investigation in the second trial, either as to the issue on which a new trial was denied, or as to that on which a new trial was awarded.

Appeal.—Where a Judgment is Affirmed as to Certain Issues and reversed and remanded for a new trial as to other issues, it is a modification of such judgment, and such action is within the province of the supreme court.

APPEAL from Superior Court, City and County of San Francisco; J. C. B. Hebbard, Judge.

Action by M. W. Fox against the Hale & Norcross Silver Mining Company and others. Judgment for plaintiff. Defendants appeal. Reversed.

W. F. Herrin, Lloyd & Wood, Garber, Boalt & Bishop, Bishop & Wheeler, W. E. F. Deal and Ed. R. Taylor for appellants; W. T. Baggett, L. D. McKisick, E. S. Pillsbury and W. H. H. Hart for respondent.

TEMPLE, J.—This action was brought by plaintiff, as a stockholder in the corporate defendant named, against the corporation, the directors thereof, and various other persons, charging a fraudulent conspiracy between the directors and others to cheat and defraud the corporation. Among other preliminary allegations, the plaintiff charges that Hayward and Hobart were largely the owners of the stock in the Nevada Mill and Mining Company, and controlled and managed the Mexican Mill, and that they conspired with other persons to defraud the Hale & Norcross Silver Mining Company. For that purpose they procured the control of the last-named corporation, and, by certain practices set forth, caused certain persons named as defendants to be elected directors of

said corporation. It is charged that said directors were at all times controlled by said Hayward and Hobart in all official acts; that they all conspired to cheat and defraud the corporation by various cunning and fraudulent acts, practices, arts and devices, intending by them to have the effect of increasing their own gains at the expense of the corporation and its stockholders. Certain devices and practices are then stated, from which it is alleged damage resulted to the corporation. Without attempting to set them out, they may be indicated thus: (1) Refusing to report to stockholders assays of the ores taken from the mine, that the conspiracy and combination to defraud might be carried out more easily and successfully. (2) Mixing low-grade ores with the high-grade ores, to increase the amount of ore to be milled, and the profit of the mill, and for the purpose of hiding and concealing the true value of the high-grade ore. It is charged that the corporation suffered damage from this source to the amount of $500,000. (3) They caused false and fraudulent assays to be made of the pulp at the mill. (4) The fourth is as follows: "As another of the acts, practices, arts and devices concocted in aid and furtherance of said fraudulent conspiracy and combination, the said persons and corporations as aforesaid, so controlling and directing the affairs and management of the said mills, and the agents and employees thereof, caused and directed all of said ores to be handled or managed by a fraudulent system of imperfect milling or reduction, intending thereby to leave in the tailings, slimes and residues a large portion of the gold and silver contained in said ores, which tailings, slimes and residues plaintiff is informed and believes were afterward worked over for the joint benefit of the aforesaid conspirators, and to the great damage and loss of the said mining company and its stockholders, to wit, about one million one hundred thousand ($1,100,000) dollars." (5) Alleges excessive charge for milling. (6) The sixth alleges that six thousand tons of ore, worth $280,000, were sent by the conspirators to the Choller and Nevada Mills, which were wholly lost to the corporation. It is then charged that the directors, knowing all the acts, practices and devices of said conspirators to cheat and defraud the corporation, combined with said persons to cheat and defraud said corporation, and did cheat and defraud said mining company, "through said conspiracy, combina-

tion, acts, practices, arts and devices, of large quantities of bullion and money, the property of said mining corporation, to wit, about two million one hundred thousand dollars ($2,100,000)."

All the material allegations were specifically denied by the appellant, but the court upon the first trial found in substance for the plaintiff upon all the issues. The only damage found, however, was for the overcharge for milling, and that resulting from the alleged fraudulent and imperfect milling of the ores. Upon the last-mentioned issue, as to the fraudulent and imperfect milling, the findings were as follows: "That the defendants Alvinza Hayward, W. S. Hobart, the Nevada Mill and Mining Company, and H. M. Levy, by and with the knowledge, consent, and approval of the defendant trustees, and for the purpose of consummating the fraudulent conspiracy and combination to cheat and defraud the Hale & Norcross Silver Mining Company and its stockholders, did cause and direct all of said ores to be handled and managed by fraudulent system of imperfect milling, whereby there was left in the tailings, slimes and residues of said ores a large portion of the gold and silver contained in said ores, which tailings, slimes and residues were the property of the Hale & Norcross Silver Mining Company, and a portion of which tailings, slimes and residues were afterward worked over by said conspirators, who took, carried away, and appropriated the gold and silver extracted therefrom for the benefit of themselves, to the damage and loss of the said Hale & Norcross Silver Mining Company and its stockholders." "That during all of the times from about March 1, 1887, until July 1, 1890, an unlawful and fraudulent combination and conspiracy existed by and between the defendants Alvinza Hayward, W. S. Hobart, the Nevada Mill and Mining Company, and H. M. Levy, and the defendant directors, and others, which unlawful and fraudulent combination and conspiracy was organized and conducted with the intent and for the purpose of wrongfully and unlawfully diverting valuable property, consisting of ores, residue of ores, and bullion, belonging to the Hale & Norcross Silver Mining Company and its stockholders, from said corporation and its stockholders, to the use and benefit of the members of said unlawful combination and conspiracy, and said unlawful and fraudulent combination and conspiracy, organ-

ized and conducted with the knowledge, consent and approval of the said defendant directors, for and during all the time that each was a director or trustee of said Hale & Norcross Silver Mining Company; and there was wrongfully and fraudulently diverted, taken, carried away and converted by said defendants, by and through said fraudulent and unlawful combination and conspiracy, valuable property, consisting of ores, residues of ores, and bullion, belonging to the Hale & Norcross Silver Mining Company and its stockholders, to the damage and loss of said corporation and its stockholders, in the sum of $789,618, and the further sum of $222,217, caused by the fraudulent, excessive and exorbitant charge for crushing and milling said ores, making an aggregate loss to the said Hale & Norcross Silver Mining Company of $1,011,835. That all the defendants herein except the Hale & Norcross Silver Mining Company are, and were at various times between the first day of March, 1887, and the first day of July, 1890, members of the said unlawful combination and conspiracy.''

An appeal from that judgment, and from an order refusing a new trial, was taken to this court by the present appellants and others; and a full statement of the facts of the case, and of the issues involved, may be found in the opinion then rendered: 108 Cal. 369, 41 Pac. 308. The effect and meaning of that decision and opinion are of prime importance in the determination of this appeal. The following is a summary of the conclusions reached and of the judgment rendered: ''(1) That the defendants Hayward, Hobart and Levy formed a fraudulent combination and agreement for mining and milling the ores of the Hale & Norcross Silver Mining Company, but that the other directors of the mining company were not parties to this agreement, but were merely negligent in the performance of their duties, and are therefore chargeable only with such negligence, and are not chargeable with any actual fraud. (2) That the Mexican and Nevada Mills were under the control of Hayward, Hobart and the Nevada Mill and Mining Company, but that it is not shown that the Vivian Mill was under their control. (3) That Hayward, Hobart and Levy, with the acquiescence and consent of the officers of the Hale & Norcross company, controlled the affairs of that company. (4) That Hayward, Hobart and Levy, in pursuance of their agreement aforesaid,

caused a quantity of inferior and worthless ores to be extracted from the mine, and to be milled, after being mixed with ores of a higher grade. (5) That the Hale & Norcross company paid $7 per ton for milling said ores; that the actual cost of milling the same was about $4.50 per ton; that, by reason of their fraud as aforesaid, the said defendants were entitled to receive only the actual cost of milling said ores; that, by reason of having been required to pay $7 per ton for milling said ores, the Hale & Norcross company had sustained damage in the amount of $210,197.50. (6) That the evidence is insufficient to sustain the finding of the court that the Hale & Norcross company had sustained damage, by reason of the improper milling of the ores, in the amount of $789,618, and that the actual amount of damage sustained thereby cannot be determined from the findings of the court. (7) That the Nevada Mill and Mining Company, not having been served with process, was not before the court as a defendant. The cause is therefore remanded to the superior court, with the following directions, viz.: The judgment appealed from is set aside, and the superior court is directed to enter a judgment, as of the date of its former judgment, against Alvinza Hayward and H. M. Levy, for the sum of $210,197.50, with interest from that date, upon the issue presented by the claim for having paid an excessive price for milling the ore in the Mexican and Nevada Mills, and upon that issue the order denying a new trial as to these appellants is affirmed. As to the other appellants, except the Nevada Mill and Mining Company, the order denying a new trial as to this issue is reversed, and a new trial thereon ordered. Upon the issue presented by the claim for damages sustained by reason of the imperfect and fraudulent milling, the order denying a new trial is set aside as to all the appellants; and the court is directed, upon the evidence already taken in the case, and such other evidence as may be presented by either party, to make findings in accordance with the views hereinbefore expressed. Upon the amount, if any, of such damage sustained by the Hale & Norcross company, in addition to finding the value of the ore delivered to the mills, the court is directed to find the amount and value of the bullion that should have been returned therefor. The court should also find what amount of this value of the ore delivered to the mills was necessarily lost in working, or

would not, under fair milling, be separated from the baser matter, and also the amount of the money, if any, received by the mills from the working or sale of the tailings or residue of the ores.''

From this it appears that the former judgment gave damages to the plaintiff only upon two claims made in the complaint: (1) For the difference between the charge for milling the ores and the actual cost; and (2) for damages sustained by reason of imperfect and fraudulent milling of the ores. As to the first of these, the order denying a new trial was affirmed. As to the second, the order was reversed, and a new trial granted, and upon that new trial the court was directed to find upon certain specific questions. The other issues, in regard to alleged frauds, from which no damage was shown or claimed to have resulted, were regarded as immaterial. The ground upon which this court sustained the finding as to the alleged excessive charge for milling the ores is plainly stated. It was, to restate it plainly and briefly, because it appeared that Hayward and Hobart, or their agents, had bribed Levy, the real manager of the mining corporation, to give the mills controlled by them the milling of the ores. They did control the mining corporation, as to that contract, and therefore their relation to the company was that of trustees, and they could not be allowed to make a profit out of a contract so procured. The corrupt arrangement entered into between Hayward and Hobart, on one part, and Levy, on the other, is called a ''conspiracy,'' in the complaint, and also in the former opinion of this court, and a great deal seems to be made out of the epithet. It seems to be understood that it tends to prove a continued concert of action to cheat and defraud the mining corporation. The facts shown do not really establish a conspiracy. The whole arrangement—so far as the proof goes—at the worst, shows that the president, who was in fact sole manager of the corporation, was bribed to give them the milling of the ores. There is no proof that the arrangement between the defendants, bad as it was, went beyond this. If metal was by design sent into the tailings, to enrich them for the advantage of the mill owners, or if bullion was to be feloniously abstracted, Levy, so far as the proof shows, would not profit thereby; and this limitation upon the so-called conspiracy is clearly shown in the opinion rendered on the first appeal.

After calling attention to the fact that the contract was simply that Levy should share in the profits of the milling done by the mills controlled by Hayward and Hobart, the opinion proceeds to state how far the corrupting influences of this illegal contract would naturally go. It is said: "It is next contended that the finding to the effect that Hayward, Hobart and the Nevada Mill and Mining Company, in conjunction with the other defendants, controlled all the business affairs of the Hale & Norcross company, is against the evidence. This finding is material only so far as it relates to the mining and milling of the Hale & Norcross ores, and as to those matters the evidence fully warrants the conclusion that a majority of the directors were, as above stated, simply acquiescent or passive, and that Levy did as he pleased. Whatever inference, therefore, as to participation by the mill owners in the control of the mining company may be legitimately drawn from the existence of the unlawful contract for a division of the profits of the milling, or from the manner in which the ore was milled, or from an inadequacy of returns of bullion, or neglect of proper precautions in behalf of the mining company, is to be considered as a fact proved. Undoubtedly the existence of the contract supplied a motive to both parties to increase the amount of milling by the extraction of low-grade ores; and it may fairly be argued that it also offered an inducement to Levy to connive at a careless and inefficient system of milling, by which a larger number of tons would be milled at the same cost, and consequently at a larger profit. But proof of a motive to commit a wrong is scarcely sufficient, by itself, to prove that the wrong has actually been committed; and it remains to be considered whether there was any other substantial evidence of the mining of the low-grade ores, or of imperfect milling." According to the evidence, the understanding between Hayward, Hobart and Levy was that, if Levy would retire from the contest in the election of directors, he should have one-eighth of the profits of the milling of all ores from the mine which was done at their mills. Afterward it was conceded that he might be a director, and still retain his interest in the contract; and finally he became president and the sole manager of the mine and of the corporation. It is quite conclusively shown that all he did receive was a share in the profits of

milling the ore at $7 per ton. There is nothing which even tends to show that there was a conspiracy to purloin the bullion, and divide profits so made. Nor is there any allegation in the complaint of any fraud of that character, or of damages so resulting. Yet the last judgment is necessarily and admittedly based upon that very proposition. It is conceded, as is also shown by the opinion of the learned judge of the trial court, that the amount of the judgment was reached in this way. The true value of the ore sent to the mill was estimated as nearly as practicable. The defendants were then given credit for the estimated value of the slimes and tailings (that is, of the residue after milling), also for an estimated amount of moisture in the ore. This was deducted from the estimated value of the ore, and the difference is the amount of bullion which should have been returned. Of course, if that value in bullion was obtained from the ore, and false returns were made, the portion not returned to the mine was stolen by someone. The judgment, in effect charges Hayward, Hobart and Levy with the larceny.

It is strenuously contended by the appellants that no such fraud is charged in the complaint, and no damage from any such source claimed. The finding, it is said, is not responsive to any issue made in the case. It is quite obvious that, so far as the pleadings are concerned, this position is sound. The charge of damage resulting from an alleged system of fraudulent and imperfect milling is specific. It was done with the intent of unduly enriching the slimes, tailings and residues, which it is charged were afterward worked over for the joint benefit of the conspirators, to the damage of the mining corporation in the sum of about $1,100,000. This means, and was understood to mean, that the ores were intentionally so milled as to leave a large portion of the gold and silver in the residues, which by fair milling would have been extracted and returned to the mining company. Eliminate this charge, that the so-called conspirators purposely left a portion of the valuable metals in the residues, and there is no allegation in the complaint of any fraud with reference to the milling or of any resulting damage. Fraud is a conclusion of law, and, when made a ground of action, the facts constituting it must be stated. The law upon the matter is stated by Bliss, in his work on Code Pleading (section 211), as follows: "In alleging fraud, it will not suffice to say that the

party fraudulently procured or fraudulently induced or fraudulently did this or that, or that he committed, or was guilty of, fraud. The facts which constitute the fraud must be stated. Fraud is a conclusion of law. A statement that defendants in 'concert, did, by connivance, conspiracy, and combination, beat and defraud the plaintiff out of,' etc., does not state the facts that constitute the cause of action. It does not appear what they did. The legal conclusion—an epithet only—is applied to their acts, without knowing what they were. Fraud is not a fact. It is a name given by law to certain facts, to certain conduct of the accused party. The fact may be misrepresentation, deceit, specifically stated, and the term 'fraud' is the legal epithet applied to such facts. It is not the fact, not the thing done, but only a conclusion from the thing done. The term 'fraud' or 'misrepresentation' may not be used at all, if the facts appear.'' Unless the facts are stated—at least, in a general way—no cause of action is stated; and this court has ruled that the facts must be alleged with sufficient distinctness to enable the adverse party to come prepared with evidence upon the general questions of fraud which will be raised: Capuro v. Insurance Co., 39 Cal. 123. See, also, Taylor v. Bidwell, 65 Cal. 489, 4 Pac. 491; Herron v. Hughes, 25 Cal. 556; Gray v. Galpin, 98 Cal. 635, 33 Pac. 725; People v. McKenna, 81 Cal. 158, 22 Pac. 488; Meeker v. Harris, 19 Cal. 279, 79 Am. Dec. 215; Triscony v. Orr, 49 Cal. 612. The answer to this proposition contained in respondent's brief is that this court at the former hearing declared ''that there was an issue fairly and properly made by the complaint, which this court declared to be 'an issue presented by the claim for damages sustained by reason of the imperfect and fraudulent milling of the ores of the Hale & Norcross Mining Company by the defendants,' '' and that the trial court was directed to take additional evidence and make findings upon that issue. This certainly is no answer to the argument. No one disputes that there is an issue made by the pleadings upon the claim for damages resulting from the alleged fraudulent and imperfect milling of ores. The question is, simply, What is that issue? No fraud or imperfection in the milling is charged, except that a portion of the valuable metals was purposely left in the ore, and sent into the tailings, to be, and which was, thereafter appropriated by the alleged conspirators. That the writer

of the former opinion understood that such was the issue presented by the pleadings, and which had been tried, and upon which a new trial was asked, clearly appears from the opinion. The issue is plainly so stated: "That said mill owners, in furtherance of the objects of the conspiracy, caused all of said ores to be handled by a fraudulent system of imperfect milling, intended to leave in the tailings, slimes and residues a large portion of the gold and silver contained therein, which tailings, slimes and residues were afterward worked over for the joint benefit of the conspirators, to the damage of said mining company and its stockholders in the sum of about $1,000,000": 108 Cal. 381, 41 Pac. 310. Again, on page 400, 108 Cal., and page 317, 41 Pac.: "The next, and by far the most important, exception to the decision of the superior court, relates to the various findings to the effect that Hayward, Hobart, Levy and other defendants worked the ores of the Hale & Norcross company by a fraudulent system of imperfect milling, by which a large portion of their value was left in the slimes, tailings, and residues of the mills." The court then proceeds to consider at some length the evidence upon which the court had found that the ores had been fraudulently milled, and the damage ascertained, and finally says that the value of the silver bullion was incorrectly determined, and that for this reason alone a new trial must be had. Then occurs the passage, much relied upon by the respondents, as to the proper method of determining the damage. This amounts really to nothing more than the statement that, when the court shall determine the amount of bullion which should have been returned, the value of that wrongfully retained in the slimes and tailings should be estimated as stated. And the court proceeds to say that, since a new trial must be had upon the question of damages, it is unnecessary to discuss the evidence offered to corroborate the general charge of fraud in the milling, by showing how it was possible to debase the battery samples, or to run the value into the tailings by improper amalgamation, or to abstract the amalgam or the bullion; and the opinion proceeds: "All these things have their place as tending more or less to corroborate other evidence of improper milling, and are entitled to such weight as the trial judge may think belongs to them when considered with the more direct evidence of the assay value of the ores, the bullion returns made,

percentage that ought to be returned with correct milling.''
It is then stated that the trial court concluded that, inasmuch
as the proper return of bullion was not made, a large part
of the ore was improperly run into the tailings, and conse-
quently the tailings did not belong to the mill company.   All
this clearly indicates that the court understood that a new
trial was granted upon the entire issue as to damages claimed
for fraudulent and imperfect milling, including the issue
whether the milling was fraudulent and imperfect, as well
as to the amount of damages. It must be remembered that
''whether the evidence is sufficient to establish the fact is a
question of fact, which must be determined by the tribunal
to which it is submitted. A declaration by the appellate
court that it does establish the fact would be outside of
its functions, and would not be binding upon the trial court'':
Wallace v. Sisson, 114 Cal. 42, 45 Pac. 1000. Had the su-
preme court said that it was proven that there had been a
fraudulent and imperfect milling of the ore, but that the
amount of damage could not be ascertained, and therefore,
as to the issue in which such damage was claimed, a new
trial was ordered, the trial court would not be bound by the
statement as to the facts, but would be required to try the
whole issue.

The order refusing a new trial upon the issue raised upon
the claim for damages alleged to have resulted from a fraudu-
lent system of imperfect milling was reversed. This, of itself,
granted a new trial upon that entire issue, and not as to
the amount of damages only. The language of the judgment
is sufficient to identify the issue upon which a new trial was
granted, and that is all that was necessary. Upon a part
of that issue (that is, as to the amount of damage, ''if any''),
the court was directed to find upon certain special matters.
This itself was equivalent to saying that, if there had been
a fraudulent milling of the ores as charged, and damage had
resulted therefrom, then the court should find as directed.
It was not intended to limit the inquiry to these matters,
however. The required findings are probative, and all have
a bearing, not only upon the amount of the damage, but
upon the question as to whether the ores were fraudulently
milled in order to run the gold and silver into the tailings
for the advantage of the mill company. The court was di-
rected to find, upon these points: (1) The value of the ore;

(2) the amount which would have been returned by fair milling; (3) what could not have been separated from the ore by fair milling; and (4) how much the defendants had realized by working over or selling the residues. All these inquiries have a direct bearing upon the question as to whether the ore had been fraudulently and imperfectly milled, with intent to enrich the tailings, slimes and residues; but it is difficult to discover any reason for requiring a finding upon all these matters, if the new trial was only to ascertain the amount of damage, and this was a direction as to how that was to be determined. Counsel for the respondent say that they do not know why the court was directed to find how much the defendants realized from working the tailings, unless that amount was to be added to the damages ascertained by the other process, by which the court found what ought to have been returned. Of course, that would have been absurd; for when the court determined the amount of metal in the ore, and how much was in the tailings, slimes and residues, and concluded that the difference showed what had been extracted, evidently there could be no further damage, if, as now found, the milling was perfectly done. It was not intended that the court should determine the damage by either any or all the processes indicated, to the exclusion of other methods; nor was it supposed or indicated that necessarily any question as to the amount of damage would be tried at all. Not only is the presumption very strong that the new trial granted was that which was asked for and had been denied upon an issue then in the case, but it is not to be believed, unless indicated by language to which no other construction can possibly be given, that the supreme court sent the case down with directions to try a question which was not before in the case, and which would award to the plaintiff damages for which he had not asked. Perhaps the statute of limitations had then run against the claim, and the defendants were thereby prevented from pleading it. The issue was twofold: Was there a fraudulent conspiracy to imperfectly mill the ores, as charged, and were the ores so milled to the injury of the mining corporation? If this be answered in the affirmative, the question then is, How much has the plaintiff been injured? Upon the first part of this inquiry the presumptions are with the defendants all through the case, both as to the

existence of fraud, and the extent of it.   The presumption of innocence is one of the strongest disputable presumptions known to the law: Code Civ. Proc., sec. 1963, subds. 1, 19; Hunter v. Hunter, 111 Cal. 261, 52 Am. St. Rep. 180, 31 L. R. A. 411, 43 Pac. 756.   The fraud being proven, upon the question of damage only are the presumptions against the wrongdoers.   It is evident that the court entered upon the retrial upon the theory that the question of fraud had already been determined against the defendants, and that such finding had been affirmed by this court.   It is entirely evident that there was no attempt to try the issue made by the pleadings, which was a claim for damages for milling the ores under a system of fraudulent and imperfect milling, which was intended to, and which did, run into the tailings, slimes and residues a large portion of the gold and silver contained in the ore, and which, by fair and honest milling, would have been extracted and saved for the benefit of the mining corporation.   Practically, though not formally, the court found that the ores had been properly milled, when in its computations it gave defendants credit for the ascertained value of the tailings, slimes and residues, and charged them with the ascertained value of metal contained in the ore.   Necessarily this would be, when formally stated, a finding in favor of the defendants upon the issue as to fraudulent and imperfect milling which is made by the pleadings.

But suppose the respondent's position can be maintained, that under the general allegations of fraud, notwithstanding the averments of particular acts, and of damages resulting from such acts, the plaintiff could maintain a claim for false returns made by the mill, and the purloining of bullion, still it is evident that the case was tried upon a wrong theory, because, as already stated, it was assumed that the alleged conspiracy was not only proven, but that the new and unpleaded charge of stealing the bullion was within the conspiracy.   Respondent, in his brief, claims that such was the fact, and that the action of the court is to be judged from that standpoint.   If it were so found in the first trial, and had this court decided that the finding was fully sustained by the evidence, yet the order granting a new trial would have set the whole matter at large.   This court would then only have said that there was evidence sustaining the finding, not that it was sustained by the preponderance or the weight of the

evidence. But this court did not say anything of the kind. Denying a new trial upon the issue as to the alleged overcharge for milling did not imply anything of the kind. That was based upon the proposition that Hayward, Hobart and Levy controlled the mining corporation, and contracted with themselves for milling its ores. How they got control of the corporation was utterly immaterial upon that issue. Had it been gained in the most honest and honorable manner imaginable, the result would have been the same. Nor did the judgment imply, or did the evidence show, that the defendants had wronged the corporation out of a dollar. The corporation paid them what it would have been compelled to pay any other mill for the service. It could not have had the work done cheaper. That large judgment is sustained, not because the corporation was cheated out of the money, but under a rule of public policy which declares illegal contracts made by a trustee with himself, whereby he makes a profit, and compels him to pay over all the profit to his beneficiary, even though the beneficiary was not injured, and the profit would have been a fair profit but for the disability. But, if that finding were based upon a fraudulent conspiracy, it would have no bearing upon the question as to whether there was a further illegal agreement to defraud the corporation by making false returns of the bullion obtained from the ore, and by feloniously abstracting the bullion. The presumptions upon such further issue would still be in favor of the alleged conspirators. The burden of proof as to the whole issue is still with the plaintiff. In Conard v. Nicoll, 4 Pet. (U. S.) 291, 7 L. Ed. 862, the supreme court of the United States laid down certain rules as to proof of fraud, which have been often followed since: (1) Actual fraud is not to be presumed. (2) If the act may be attributed to an honest motive, equally as to a corrupt practice, the former is preferred. (3) "If the person against whom fraud is alleged should be proved to have been guilty of it in any number of instances, still, if the particular act sought to be avoided be not shown to be tainted with fraud, it cannot be affected by those other frauds, unless in some way it be connected with, or form a part of, them": See, also, Estate of Kidder, 66 Cal. 487, 6 Pac. 326; Paxton v. Boyce, 1 Tex. 319.

It is presumed, even in favor of a trustee, that he has done his duty; and when he has rendered an account of his

stewardship, which appears to be sufficient and fair, the account is presumed to be correct. In order to charge him with fraud or unfaithfulness, the beneficiary must falsify the account by evidence which does more than raise a suspicion. The evidence must be satisfactory, within the rule stated in section 1833 of the Code of Civil Procedure. It cannot be conjectured from the fact that the defendants are bad men, and have been guilty of other, independent frauds. I do not think guilt can be properly found from a comparison of a number of conjectures, or the addition of various approximate estimates, by which the court ascertained the value of the ore only "as nearly as practicable," when in the same finding the estimates upon which reliance is placed are shown to be twenty-eight per cent above the real value. By deducting from this estimate the amount of gold and silver which was estimated to have passed into the slimes, tailings and residues, and making another deduction for moisture, which certainly was simply guessed at even by the witnesses, the court found the amount of bullion which ought to have been returned, and determined that the difference between that sum and what was actually returned was purloined by the defendants in pursuance of a conspiracy to cheat and defraud the mining corporation. And it must be remembered that there does not appear to have been any suppression of evidence. This point is discussed on the first appeal, and it was so held there. But upon the last trial the employees of the mill were subjected to cross-examination, and answered fully, and with apparent candor. The books were produced, with clerks and bookkeepers, and the fullest scope for the investigation allowed. Hayward's private books were produced, and Hayward, Hobart and Levy have been upon the stand. All the employees who worked in the mill testified fully, and to the effect that every ounce of bullion which was extracted from the ore (except, perhaps, that recovered from the concentrates, which the mill company claimed) was honestly accounted for and returned to the mining company. Nothing of an inculpatory character was found in the books. Under such circumstances, nothing is to be presumed against the defendants as to this charge. And in weighing the evidence upon this charge the court should, at every step, have adopted the view which was consistent with innocence, unless the evidence to the contrary clearly preponderated. But

what is the evidence which implicates Hayward, Hobart or Levy in the supposed theft? There is certainly no evidence proving an express agreement or conspiracy to so defraud the mining company. In the absence of such proof, it must be shown that Hayward, Hobart and Levy personally participated in purloining the bullion; that they in some way aided, abetted or at least that some of the fruits of the fraud were received by them. This could be shown by circumstantial evidence. I have not been able to find in the record, including that upon the first appeal, a scintilla of evidence which tends to prove anything of the kind. The only evidence that bullion has been purloined is the discrepancy between the value of the ore as found, and the return made by the mill. Conceding that the discrepancy proves that some of the metal extracted was not returned, who took that which was not returned? It is conceivable that the employees could have taken and applied it to their own use. Indeed, if they did take it under circumstances that would subject them to a prosecution for felony, it would be strange that they would do it for the profit of others. Hayward and Hobart were not there. It is not shown that the defendants knew of or countenanced such theft, but, so far as their testimony and that of their employees could prove it, the contrary is shown. Not a pound of the bullion which is supposed to have been stolen has been traced to them, or to anyone else. One of the difficulties in the plaintiff's case is the number of confederates the conspirators would have been compelled to employ to enable them to carry out such a scheme. It is hard to believe that so many people, many of them well-to-do in the world, would have conspired to commit such a felony, or, if they did, that they would have trusted so many people with a secret which, if known, would consign them to the penitentiary. Another difficulty is in believing that about $500,000 worth of bullion consisting of sixty per cent of silver and forty per cent of gold, was feloniously abstracted under such circumstances, and by the most thorough and searching investigation not one pound of it can be traced to anyone. The mill corporation would perhaps be responsible if the bullion was shown to have been extracted from the ore. But the defendants are not even sued as stockholders in the corporation. Proof that they controlled the corporation would not make them liable as conspirators. Stockholders have a

right to control the corporation of which they are constituents. This would not make them personally liable for thefts committed by their employees. To make them so responsible, guilty knowledge and participation must be shown, and much more so when they are simply charged as conspirators.

Probably, when the action was commenced, plaintiff hoped to be able to prove the fraudulent milling of the ores as alleged. Had he been able to do so, it would have been easy to believe that the fraud was perpetrated in pursuance of the same understanding or conspiracy under which the defendants obtained control of the mining corporation. It would also have proved a fraudulent appropriation of the property of another; that is, a taking under color and pretense of right, rather than an unblushing larceny, of which the defendants were in fact found guilty. It would also have been such a taking as would imply guilty participation on the part of the managers of the milling corporation. Their corrupt gains would be acquired only as stockholders. The control of the mining corporation, that there might be no complaints of ineffectual milling, and the participation of Levy in the profits derived from the slimes and tailings, if it could have been shown, would have favored the idea of a conspiracy. But when the plaintiff found that the milling had been thorough and efficient, and he was compelled to wage his battle from a new base, there were no facts so strongly favoring the idea of a conspiracy. In fact, the charge of a conspiracy was entirely irrelevant to the claim that bullion had been converted. If proven, conspiracy would have had no other effect than to connect the individual defendants with the trespass. The cause of action was the conversion. The conspiracy, if proven, was evidentiary merely. And then, if the bullion was converted by a larcenous taking, there is no presumption that it was done for the corporation or its stockholders, or even for the benefit or with the knowledge of those who, as owners of large amounts of stock, controlled the corporation. The great discrepancy between the mining-car assays and the return of bullion made is the only evidence upon which is based the finding that bullion has been converted. Does that fact tend to show that the conversion was in pursuance of a preconceived design on the part of Hayward, Hobart and Levy? The learned trial judge says it is beyond question that the battery assays are false, and remarks that for no

single month from January, 1887, to July, 1890, during which time more than 80,000 tons of ore were milled, did the percentage equal the car-sample assay, and adds: "Considering that all assays are somewhat speculative, and never absolutely exact, the fact that in all this mass of ore there was scarcely a single battery assay that even by chance went higher than the car assays is startling, in its evidence of deliberate, habitual design." Since the court found that the average of eighty-four thousand car-sample assays showed a value of twenty-eight per cent above the true value ascertained by him as nearly as practicable, and since he speaks in this very sentence of the assays as speculative, I doubt if there is any such implication in the fact. If the battery assays had frequently exceeded such car-sample assays, that fact would have condemned the battery assays. But, admitting that the difference is startling, how does that tend to prove that the conversion of the bullion, if there was any such conversion, was in pursuance of the alleged conspiracy? According to the theory of plaintiff, the defendants controlled both sets of assays. Why, then, did they allow this discrepancy to exist, if they were purloining the bullion, and were debasing the battery assays to hide the theft? The effort to show that the car assays were concealed was certainly a failure. There is at least a hint in the evidence that they were published daily. But, whether concealed or not, I do not see why such discrepant assays should have been allowed, if there was this design to purloin the bullion on the part of the personal defendants. In that case they were not wanted as a check on the mill. There might have been a motive for having the car assays too high, and that suspicion, if we are to indulge in suspicion, is as probable as the other. Perhaps some influential mine owners were then unloading. Certainly the discrepancy, however startling, cannot be accounted for upon the supposition that bullion was purloined by anyone, in the absence of other inculpatory circumstances; and, if such conversion were proven, the burden would still be upon the plaintiff to connect the appellants with it. That has not been done, and can only be made out by boldly claiming that this court went outside of its functions as an appellate tribunal, and found as a fact that there was a fraudulent conspiracy to defraud the mining corporation, and to purloin its bullion. I do not find any language in the opinion justify-

ing such claim, and, had there been, I doubt if we should feel bound by it. Certainly not unless it had been expressly and unmistakably so adjudged, and perhaps not then. Such a finding would not have bound the lower court, and therefore could not conclude this. Entertaining these views, it is not necessary to consider the numerous points raised as to the introduction of evidence at length.

1. I think the court erred in overruling the objections of defendants to the introduction as evidence of the books and statements of officers and bookkeepers of the Overman Silver Mining Company. The question is not simply whether the result of the reduction of the ore of that mine could be shown, and compared with the working of ore in the Nevada Mill. The objection is to the mode of proving the results of working ore in the Overman Mills. The case of Insurance Co. v. Weide, 9 Wall. (U. S.) 677, 19 L. Ed. 810, 11 Wall. (U. S.) 438, 20 L. Ed. 197, and 14 Wall. (U. S.) 381, 20 L. Ed. 894, does not seem to me to have any bearing upon this question. There the evidence offered was not, as here, the unverified statement of third parties, but was direct. Had the working of similar ores in other mills been shown by competent proof, for the purpose of comparison, I think it would have been proper, and that is all that was decided in the case cited which is pertinent here. The same remark applies to another class of testimony to which objection was made. I think it was incumbent upon the plaintiff both to show that by sampling and assaying the value of the ore could be ascertained, and also to show that it was done by the method pursued in this case. In fact, the first proposition is involved in the last. On no other theory could the plaintiff be sustained in putting questions to experts on the assumption that samples were fair samples, or were fairly taken, or that there were no disturbing elements. Of course, if the samples were fair samples, and were properly assayed, that would end the controversy. But the question at issue was whether they were fair samples—did truly represent the ore in the car—and whether they were properly assayed. The questions assumed the point at issue, unless that was whether by sampling and assay the value could be determined. The questions and answers did not tend to show whether the samples involved here were fair, or that the assays were correct. It seems to me that all the questions put by

plaintiff upon this subject assumed that the assays had been properly made.

2. The rule is that whenever a complaint is amended in any material respect, so as to present new questions upon which issue may be taken, the defendant may answer as of course; and in such case I do not see how the court can limit the defenses which may be interposed, any more than it could the defenses which might have been made in the first instance. The case is different where the court is asked to permit an amended answer to be filed. In this case I think the defendants had the right to answer, but I fail to perceive in what respect they have been damaged by the refusal. The amended complaint was allowed upon the first trial, to make it conform to the proofs. As to that trial, it served no other purpose. It should not be allowed in such case to present issues which have not been fully tried, and no advantage can be taken from the fact that some of the new allegations have not been controverted. The new trial was had after the amended complaint was filed. It is not contended that it is materially different from the former complaint, and the only injury claimed to have resulted is that the defendants could have pleaded the statute of limitations. It is not contended that the demand was barred when the action was commenced, or when summons was served on these defendants, but some of the defendants were sued by fictitious names. The summons was, however, personally served upon them. The complaint was amended so as to substitute the names of the defendants who had been served, for the fictitious names. Before this was done, it is thought, the limitation of the statute had accrued. I think the amendment was merely formal, and that the defendants were made parties in reality when the summons was served. True, they should still be made parties to the record as they were, but after that was done they are to be treated as having been parties from the time of service of process upon them. The answer already in was as appropriate to the complaint as amended as before the amendment, for it was in all material respects the same identical pleading.

The last point which it is necessary to consider is whether upon the new trial the question was still open as to the right of the plaintiff to bring this action as a stockholder of the Hale & Norcross Silver Mining Company. Evidence upon this subject was taken upon the first trial, and the court found fully

upon the subject. The facts which authorize the plaintiff to sue in behalf of the company were found. Upon the first appeal the defendants could have presented the question both upon the law and the evidence. By failing to except to the sufficiency of the evidence to sustain the findings, they waived that claim, and, there being no doubt as to the sufficiency of the findings to show the right of the plaintiff in that regard, this court necessarily concluded upon that record that the suit was properly brought. There was really no demand for a new trial—none that this court could entertain upon that ground—and no new trial upon that issue was awarded. The judgment here was an unusual one, no doubt. Appellants claim that, if the whole judgment was not vacated, it was one which this court had no power to make. They say this court can only affirm, modify or reverse the judgment appealed from; and, as they contend, the judgment was not affirmed or modified, and must have been reversed, as they also say it was in terms. The judgment, as pronounced here, reads: ''The cause is therefore remanded to the superior court with the following directions, viz.: The judgment appealed from is set aside, and the superior court is directed to enter a judgment as of the date of its former judgment against Alvinza Hayward and H. M. Levy for the sum of $210,197.50, with interest from that date, upon the issue presented by the claim for having paid an excessive price for milling the ore in the Mexican and Nevada Mills; and upon that issue the order denying a new trial is affirmed.'' As to another issue, specially mentioned, the order denying a new trial was reversed, and the court was directed to retry that issue, and certain directions were given as to the mode of trial. This judgment is not adequately described by quoting the first sentence, ''The judgment appealed from is set aside.'' That sentence is limited and explained by what follows. The case was not sent back to be tried from the beginning. Evidently a part of what had been done was to stand—all, I think, except as to the issue upon which a new trial was awarded. No findings were set aside, except upon the one issue. Upon the new trial the case would be taken as partly tried, and the trial court was told to proceed to finish the trial as directed. That which was reviewed was the order denying a new trial. The judgment was no further interfered with than was inevitable after the ruling upon the order denying a new trial. The

judgment was set aside only to effectuate that ruling. So far as the judgment was supported by the findings not vacated, it was held in abeyance until the trial (which by the ruling was left incomplete) was finished, when one judgment would be entered, covering all the issues in the case. As to the order under review, it was affirmed in part and reversed in part, and this resulted in a modification of the judgment. So that in this case the court exercised its power in all the modes to which appellants claim it was confined. Although unusual, this action does not seem to me to be irregular, or at all suggestive of an excess of jurisdiction. It was all within the province of an appellate tribunal, and not beyond the power of this court as defined in the constitution. It must follow that the issue as to the right of plaintiff to prosecute the action as a stockholder was not open for investigation upon the last trial, either as to the issue upon which a new trial was denied, or upon that in regard to which a new trial was awarded. In fact, the direction to the trial court to proceed with the unfinished and incomplete trial was a ruling upon that matter. The court held that there was a case pending, and directed the superior court to proceed with the trial, and determine the one issue left open, in order that a final judgment could be made which would cover all the issues in the case. Of course, the order awarding a partial new trial may affect some general findings, so far as they determine matters brought in question in the special issue upon which a new trial was awarded. The right of plaintiff to sue was, however, the subject of a distinct issue, which was of the nature of a preliminary inquiry. Had that been found for the defendants, the court would not have proceeded to determine the other issues. When this court directed the trial court to proceed with the trial, it necessarily assumed that inquiry upon that subject was at an end. Nor do I think this conclusion a hardship upon the appellants. They had their day in court. The proper time for them to have presented the question was upon the first appeal. They did not avail themselves of the opportunity then offered. I do not see why they should have another. The judgment will therefore be, as upon the first appeal, that the judgment below is set aside and the superior court is directed to enter a judgment, as of the date of the first judgment, against Alvinza Hayward, H. M. Levy and the estate of W. S. Hobart, deceased, for the sum of

$210,197.50, with interest from that date, upon the issue for having paid an excessive price for milling the ore in the Mexican and Nevada Mills. As to the issue presented by a claim for damages sustained by reason of imperfect and fraudulent milling a new trial is awarded, and the court is directed to proceed and try that issue, and make findings in accordance with the views hereinbefore expressed.

We concur: Beatty, C. J.; Henshaw, J.; Harrison, J.

VAN FLEET, J.—I concur in the judgment and generally in the views expressed by Mr. Justice Temple upon which it is based. Were the question of the correctness of the court's finding as to plaintiff's capacity to maintain the action open to inquiry upon this appeal, I should strongly incline to the view that it was not supported by the evidence. But I am unable to perceive wherein either the reasoning or conclusion of the main opinion upon that question can be successfully upset. As conclusively shown by Judge Temple, and as is indeed obvious, that finding was and is primarily essential to the validity of the judgment of the court below to any extent. Its correctness was in no manner attacked or questioned upon the former appeal. Upon that appeal the cause was remanded for a new trial solely as to the single issue of the alleged imperfect and fraudulent milling of the ore; and thereby, in all other respects, the findings and conclusions of the court below were manifestly as effectually sustained and affirmed as if so ordered in terms, since the lower court was left no power or discretion to reopen or disturb its findings or judgment in any other respect. In other words, our former judgment was equivalent to an express and final adjudication of the correctness of the proceedings of the court below in all respects other than the one particular as to which its action was reversed. Since this court has no power, under the constitution, to review its own final judgments (Fox v. Mining Co., 112 Cal. 568, 571, 44 Pac. 1022), upon the going down of the remittitur upon that appeal the question as to the plaintiff's right to maintain the action was definitely and finally concluded.

McFARLAND, J.—I dissent from that part of the judgment which directs the court below to enter judgment against certain appellants for $210,197.50, and from so much of the

principal opinion as leads to that result. I concur in all other respects in the opinion of Mr. Justice Temple. I am of the opinion, however, that the language of this court on the former appeal did not preclude the appellants, on the second trial, from making the point, as to the whole case, that the respondent was not a bona fide stockholder during the time when the alleged causes of action accrued, and therefore not entitled to maintain the action—a point which did not appear in the record on the former appeal, and was not on its merits then passed upon.

GAROUTTE, J.—I dissent. When this case was before the court upon the former appeal, I felt compelled to dissent from the conclusion then declared. By that conclusion it was held that the evidence was insufficient to justify the finding of fact made by the trial court to the effect that seventy-four per cent in bullion of the car-sample assay should have been returned to the Hale & Norcross Mining Company by the milling company. Upon the second trial of the case by the superior court, all the evidence introduced at the first trial was admitted, and in addition thereto other important evidence was introduced, bearing upon the issue as to the amount of bullion which should have been returned to the mining company. Upon the second trial the court found as a fact that sixty-seven per cent of the bullion as indicated by the car-sample assay would be a fair return to the mining company. It thus appears that at the second trial the percentage of bullion was reduced by the court, and at the same time the evidence upon the point strengthened. I am fully convinced that the evidence, as disclosed by the record, is amply sufficient to support this finding of fact made by the trial court. And I am therefore again compelled to dissent from that portion of the principal opinion wherein this particular issue is considered. Other questions of grave importance are involved in the appeal, and carefully considered in the opinion of the court. Owing to the press of other duties, I have not considered them, for the reason that my conclusion would not change the result of the litigation, even if by possibility such conclusion should happen to look in an opposite direction to the views therein declared.

## ON REHEARING.

### May 9, 1898.

**Rehearing.**—A Reversal of a Judgment on Appeal will be Set Aside, on the ex parte application of the respondent for leave to remit a portion thereof, and for an affirmance of the remainder, to enable the court to consider such application on a rehearing, which will be limited to that proposition.

On application for rehearing. Granted.

PER CURIAM.—The respondent having made an ex parte motion for a modification of the judgment of reversal heretofore given, it is ordered that the said judgment be vacated and set aside in order that the court may consider the application of the respondent for leave to remit a portion thereof, and for an affirmance of the remainder. The rehearing will be limited to this proposition, and the respondent will serve notice of his motion upon the appellants.

McFARLAND, J.—I dissent from the whole of the foregoing order.

VAN FLEET, J.—I dissent. If the judgment of this court is to be set aside for any purpose, I think the order should be general.